LOS ANGELES MEMORIAL
COLISEUM COMMISSION,
Plaintiff-Appellee,

v.

NATIONAL FOOTBALL LEAGUE, an unincorporated association, Baltimore Football Club, Inc. (Baltimore Colts), Buffalo Bills, Inc., Chargers Football Co. (San Diego Chargers), Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns, Inc., Dallas Cowboys Football Club, Inc., Detroit Lions, Inc., Five Smiths, Inc. (Atlanta Falcons), Green Bay Packers, Inc., Houston Oilers, Inc., Kansas City Chiefs Football Club, Inc., Los Angeles Rams Football Co., Miami Dolphins, Ltd., Minnesota Vikings Football Club, Inc., New England Patriots Football Club, Inc., New Orleans Saints Louisiana Partnership, New York Football Giants, New York Jets Football Club, Inc., Philadelphia Eagles Football Club, Inc., Pittsburgh Steelers Sports, Inc., Pro-Football, Inc. (Washington Redskins), EFK Sports, Ltd., sued herein as Rocky Mountain Empire Sports, Inc. (Denver Broncos), St. Louis Football Cardinals Co., San Francisco Forty-Niners, Seattle Professional Football (Seattle Seahawks), and Tampa Bay Area NFL Football, Inc. (Tampa Bay Buccaneers), Defendants-Appellants.

OAKLAND RAIDERS, LTD., Cross
Claimant-Appellee,

v.

NATIONAL FOOTBALL LEAGUE, an unincorporated association, et al., Cross Defendants-Appellants.

Nos. 83–5907 to 83–5909.

United States Court of Appeals,
Ninth Circuit.

Argued Oct. 5, 1984.

Submitted Nov. 8, 1984.

Decided June 16, 1986.

See also 89 F.R.D. 489, 89 F.R.D. 497.

Maxwell M. Blecher, Howard F. Daniels, Blecher, Collins & Weinstein, Los Angeles, Cal., for L.A. Memorial Coliseum.

Joseph L. Alioto, Joseph M. Alioto, Daniel J. Mulligan, Alioto & Alioto, Moses Lasky, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for L.A. Raiders.

Patrick Lynch, O'Melveny & Myers, Los Angeles, Cal., James W. Cotchett, Jr., Cotchett, Dyer & Illston, San Mateo, Cal., Daniel Gribbon, Paul J. Tagliabue, Covington & Burling, Washington, D.C., Wm. Marshall Morgan, Morgan, Wenzel & McNicholas, Los Angeles, Cal., for National Football League.

Donald G. Kempf, Jr., Michael P. Foradas, Kirkland & Ellis, Chicago, Ill., for Chicago Bears.

Before ANDERSON and NELSON, Circuit Judges, and S. WILLIAMS, District Judge.*

NELSON, Circuit Judge:

We now face the second and concluding set of appeals from the district court litigation concerning the move by the Oakland Raiders professional football team (the "Raiders") from Oakland, California to Los Angeles, California. In our earlier opinion, *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir.), *cert. denied*, ⸺ U.S. ⸺, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984) ("*Raiders I*"), we affirmed the judgment of antitrust liability against the National Football League and its member clubs ("NFL," the "League"). Here, we (1) affirm the trebled damage jury verdict in favor of the Coliseum; (2) vacate the Raiders' antitrust damage recovery, and remand for further proceedings; and (3) reverse the judgment of liability and damages on the claim for breach of the implied promise of good faith and fair dealing.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts which precipitated this litigation are summarized in our earlier opinion. 726 F.2d at 1384–86.

After an initial hung jury and mistrial, the trial in this case was bifurcated. In the first portion, the jury, in separate verdicts in May 1982, found the NFL and its member clubs liable to the Los Angeles Memorial Coliseum Commission (the "Coliseum") and the Raiders for antitrust violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and to the Raiders for breach of the covenant of good faith and fair dealing implied under California law into the NFL Constitution and By-Laws (the "contract"), to which all NFL clubs are parties.

An injunction was issued in June 1982 by the district court in accordance with the antitrust liability judgment and section 16 of the Clayton Act, 15 U.S.C. § 26. This order, along with the underlying antitrust liability issues, was immediately appealed to this panel as an interlocutory order, pursuant to 28 U.S.C. § 1292(a)(1).

The damages portion of the trial commenced in September 1982. At the trial's conclusion in May 1983, the jury awarded damages on both claims, as follows: for the Coliseum, antitrust damages of $4,860,081, trebled by the district court pursuant to 15 U.S.C. § 15 to $14,580,243; for the Raiders, antitrust damages of $11,554,382, trebled to $34,663,146, plus contract damages stipulated by the parties to equal in amount the untrebled antitrust damages, $11,554,382.

Judgment on the contract liability, which had not been entered after the liability portion of the trial, was entered after the damages phase. At that time it merged into the final judgment, which is being appealed here. *See Munoz v. Small Business Administration*, 644 F.2d 1361, 1364 (9th Cir.1981) ("[A]n appeal from the final

* The Honorable Spencer M. Williams, United States District Judge for the Northern District of California, sitting by designation.

judgment draws in question all earlier non-final orders and all rulings which produced the judgment."). Hence, we now review the judgment of contract liability on the implied promise of good faith and fair dealing, as well as both the antitrust and contract damages.

Following our *Raiders I* decision in February 1984 affirming the district court judgment of antitrust liability, appellants filed a petition for certiorari with the Supreme Court. We then proceeded with the briefing and oral argument for this second set of appeals, but withdrew the case from submission pending the Supreme Court's response. On November 8, 1984, the case was resubmitted, after the Court's denial of the petition.

## STANDARDS OF REVIEW

The district court denied the NFL's motions for directed verdict and for judgment notwithstanding the verdict on various issues and sub-issues now before us. We apply the same standard of review to each of these two types of ruling, and our inquiry is identical to that of the district court: viewing the evidence as a whole and in the light most favorab'e to the nonmoving party (the Raiders, the Coliseum), does substantial evidence support the jury's verdict or, on the contrary, is the only reasonable conclusion that can be drawn from the evidence that the moving party (the NFL) is entitled to judgment as a matter of law? *E.g., Garter-Bare Co. v. Munsingwear Inc.*, 723 F.2d 707, 709 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *California Computer Products v. IBM*, 613 F.2d 727, 732-34 (9th Cir.1979). We may not weigh the evidence and impose a result we find to be preferable as long as the jury's verdict is supported by substantial evidence. *William Inglis & Sons*, 668 F.2d at 1026.

We review *de novo*, however, questions of law, *e.g., United States v. McConney*,

728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, — U.S. —, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), as well as the district court's determination and application of state law. *E.g., Fiorito Bros. v. Fruehauf Corp.*, 747 F.2d 1309, 1312 (9th Cir.1984).

■ In reviewing jury instructions to which timely objections were made, we ask whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues. [Citations.] A court is not required to ... amplify an instruction if the instructions as given allowed the jury to determine intelligently the issues presented.

*Raiders I*, 726 F.2d at 1398. "A trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented" when "evaluated in the context of the whole trial." *United States v. Marabelles*, 724 F.2d 1374, 1382-83 (9th Cir.1984). A party is not entitled to an instruction on its theory of the case if that theory lacks support either in law or in the record. *E.g., Raiders I*, 726 F.2d at 1398; *United States v. Candelaria*, 704 F.2d 1129, 1132 (9th Cir. 1983).

■ In reviewing a jury's damages award, we must uphold the jury's "finding of the amount of damages unless the amount is 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'" *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir.1984) (quoting *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985)), *cert. denied*, — U.S. —, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). In antitrust cases, a lesser level of proof is needed to support the amount of damages than to support the fact of antitrust injury; in applying this "liberal proof of damages standard," we have required only that the plaintiff provide sufficient evidence to permit a "just and reasonable estimate of the damages." *Id.; see generally J. Truett Payne Co. v.*

*Chrysler Motors Corp.,* 451 U.S. 557, 565–68 & n. 5, 101 S.Ct. 1923, 1929–30 & n. 5, 68 L.Ed.2d 442 (1981).

## DISCUSSION

### I. IMPLIED PROMISE OF GOOD FAITH AND FAIR DEALING (RAIDERS)

■ As recently reiterated by the California Supreme Court, "[i]t is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing." *Seaman's Direct Buying Service v. Standard Oil Co. of California,* 36 Cal.3d 752, 768, 686 P.2d 1158, 1166, 206 Cal.Rptr. 354, 362 (1984) (en banc) (emphasis in original); *see also, e.g., San Jose Production Credit Association v. Old Republic Life Insurance Co.,* 723 F.2d 700, 703 (9th Cir.1984). This covenant not only "requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement," *id.,* "but also [imposes] the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Berkeley Lawn Bowling Club v. City of Berkeley,* 42 Cal. App.3d 280, 286–87, 116 Cal.Rptr. 762, 766 (1974) (quoting *Harm v. Frasher,* 181 Cal.App.2d 405, 417, 5 Cal.Rptr. 367, 374 (1960)). Even where one party retains, by virtue of the contract, a right of approval or disapproval or a discretionary power over the rights of the other, such powers must be exercised "within the parameters of the duty of good faith." *See Larwin-Southern California, Inc., v. JGB Investment Co.,* 101 Cal.App.3d 626, 639–40, 162 Cal.Rptr. 52, 59 (1979); *see also Seaman's,* 36 Cal.3d at 776, 686 P.2d at 1171–72; 206 Cal.Rptr. at 367–68 (Bird, C.J., concurring and dissenting) (good faith requires that each party act "reasonably" in light of the "justified expectations" of the other party).

■ Most important for the present case, this implied promise of good faith and fair dealing is "reciprocal," a "two-way street" which demands mutual compliance from the contracting parties. *E.g., Commercial Union Assurance Companies v. Safeway Stores,* 26 Cal.3d 912, 918, 610 P.2d 1038, 1041, 164 Cal.Rptr. 709, 712 (1980).

■ The district court provided a clear and concise statement of these principles in its jury instructions on the contract liability issue, and also instructed that "[i]f both parties have breached this implied promise, neither can recover on it." The jury then found defendants liable for breaching the implied covenant.

We cannot find the jury's verdict on this issue to be supported by substantial evidence, and consequently must reverse the district court's decision denying judgment n.o.v. The evidence presented in this case, taken as a whole, permits only one of two conclusions: either (1) neither the Raiders nor the NFL breached the duty of good faith with respect to the contemplated franchise move from Oakland to Los Angeles, or (2) both parties so breached. Either way, the Raiders may not recover under the implied covenant. The jury's implicit conclusion, that the NFL failed to act in good faith when it refused to authorize the Raider's relocation but that the Raiders did act in good faith with respect to this issue, is not a reasonable one to be drawn from the evidence, and we find it to be untenable as a matter of law. The Raiders and their managing general partner Al Davis expressed, on various occasions prior to the vote of the NFL team owners withholding League authorization for the Raiders proposed relocation, their refusal to forego these relocation plans regardless of the wishes of the NFL. They in essence denied any contractual obligation to submit their relocation plans to the League for approval, and deliberately sought to avoid or circumvent the prescribed procedure for obtaining a vote of the other teams. In fact, the Raiders even notified the League, prior to the owners' vote, that they had officially and unilaterally "moved" to Los Angeles, had begun shipping some of their team assets south, and were to be referred to thereafter as the "Los Angeles Raiders." It cannot reasonably be maintained that the NFL's subsequent withholding of

authorization, but not these actions of the Raiders, constituted a breach of the implied promise of good faith and fair dealing.

■ In so ruling, we have had to address a question of first impression, as the district court's crucial jury instruction quoted above relies upon a novel legal principle. No California court—and, to our knowledge, no other state or federal court—has confronted the question of mutuality of good faith responsibilities in the form in which it has arisen in the present case: where both parties to a contract breach the implied promise of good faith and fair dealing with respect to the same affair, incident, or transaction, do the claims nullify each other so that neither party can recover for the breach, or can each bring suit to recover the damages which resulted from the other's breach? To look at it in a slightly different way, does a plaintiff's breach of the implied good faith promise constitute a defense to a suit against defendant for breach of the same implied promise, where both alleged breaches concerned the same episode in the parties' relationship, or is such a defendant's only recourse a separate counterclaim?

Because of the stark absence of case law on this issue, the reasonable policy arguments on both sides, and the possibly far-reaching ramifications of whatever rule of law is adopted on this issue in California, this would have been an appropriate question of state law to have certified for decision to the California Supreme Court. *See, e.g., Aetna Insurance Co. v. Craftwall of Idaho, Inc.,* 757 F.2d 1030, 1034 (9th Cir. 1985); *Meckert v. Transamerica Insurance Co.,* 742 F.2d 505, 506–07 (9th Cir. 1984). Unfortunately, the State of California, unlike the majority of states in this Circuit, has not yet seen fit to follow the exhortation of the Supreme Court to create legislatively a certification process whereby its courts would be empowered to accept certain questions of state law from the federal courts. *See Lehman Bros. v. Schein,* 416 U.S. 386, 390–91, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1974). Thus we have been compelled to resolve this question ourselves.

We have been motivated by several considerations to adopt a rule whereby mutual breaches of the implied good faith obligation extinguish one another. Such a rule will tend to reduce resort to formal litigation by parties engaged in contractual disputes and misunderstandings which might be characterized as breaches of the vaguely-defined duty of good faith and fair dealing. It will encourage, instead, settlement through constructive negotiation or alternative modes of dispute resolution, thereby not only fostering the ongoing cooperation which is a primary purpose of good faith obligations, but also conserving judicial and social resources. Our willingness to pursue such policy goals has been influenced by the private nature of the breaches of contract in this case; we might have hesitated to follow such a course if other important public interests were directly at stake in litigation concerning the covenant of good faith and fair dealing. *See First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164, 1175 (9th Cir.) (separate counterclaim, and not mere reduction or cancellation of defendant's liability, held to be appropriate so that both public wrongs might be vindicated), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Finally, we see no justice in permitting a plaintiff to complain of unfair dealing in a ransaction when he himself has not fulfilled in good faith his contractual obligations with regard to that transaction. *Cf. Pond v. Insurance Co. of North America,* 151 Cal.App.3d 280, 289–90, 198 Cal.Rptr. 517, 522 (1984) ("unclean hands" doctrine applies to suits at law as well as equity); Chafee, *Coming into Equity with Clean Hands,* 47 Mich.L.Rev. 1065, 1074–75, 1091–92, 1096 (1949).

We emphasize that our ruling does not embrace a broad rule whereby any two breaches of the implied good faith promise by opposing contracting parties constitute "offsetting penalties" which cancel each other out; our ruling applies only to factual contexts such as the present one, where both breaches concerned the same issue

and occurred during one episode of the contractual relationship. *Cf. Fibreboard Paper Products Corp. v. East Bay Union of Machinists,* 227 Cal.App.2d 675, 728, 39 Cal.Rptr. 64, 97 (1964) (similar limitation in "unclean hands" context); *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir.1963) (same). Had the Raiders displayed bad faith during a *different* dispute with the NFL, a dispute that was unrelated in time and manner to the proposed relocation of the Raiders franchise, the Raiders would not have been precluded from recovering for the breach by the League in the present case.

On remand, the district court should reverse its denial of judgment n.o.v. for the NFL on the contract claim, and vacate the corresponding portion of the damages judgment for the Raiders.

## II. ANTITRUST STANDING

Section 4 of the Clayton Act, 15 U.S.C. § 15, broadly authorizes private damages actions under the antitrust laws: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." The class of persons entitled to obtain such damages has been limited by the Supreme Court, however, through the doctrine of "antitrust standing." *See Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 529–35, 103 S.Ct. 897, 903–07, 74 L.Ed.2d 723 (1983).

The requirements of antitrust standing are greater than those of standing in its ordinary, constitutional sense. *Id.* at 535 n. 31, 103 S.Ct. at 907 n. 31; *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445, 448 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985). The Supreme Court, eschewing mechanical tests of antitrust standing frequently employed by courts, has specified certain factors which are to be evaluated on a case-by-case basis in order to determine whether a plaintiff

who has suffered an injury which bears a causal connection to the alleged antitrust violation also satisfies the more demanding antitrust standing standard: (1) the motive of the defendant—whether it specifically intended to cause plaintiff's harm; (2) the nature of plaintiff's injury—whether it was of a type the antitrust laws were designed to prevent; (3) the directness of the causal connection between the violation and the injury; (4) the extent to which abstract speculation underlies the allegations of injury and of their causation by defendant's antitrust violations; and (5) the risk of duplicate recoveries or complex apportionment of damages if plaintiffs such as this are permitted to recover. *Associated General Contractors,* 459 U.S. at 537–45, 103 S.Ct. at 908–12; *Bubar,* 752 F.2d at 449.

Appellants seek to persuade us, by focusing upon two of these factors in particular, that the Raiders and the Coliseum lack antitrust standing to recover treble damages from the NFL under 15 U.S.C. § 15. In basing their argument upon only some of the factors, appellants implicitly assume that a favorable finding on each and every one of the above factors is a necessary precondition to a finding of antitrust standing. We reject any such implication. Most cases will find some factors tending in favor of standing (to a greater or lesser degree), and some against (also in varying degrees), and a court may find standing if the balance of factors so instructs. *See Ostrofe v. H.S. Crocker Co.,* 740 F.2d 739, 741 (9th Cir.1984) (discussing *Associated General Contractors*), *cert. dismissed,* — U.S. —, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 965 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). Thus, ordinarily, we will not narrowly address arguments offered against a plaintiff's standing by examining only those factors pointed to by defendants. In the present case, however, we find appellants' particular contentions to be without merit, and so do not analyze the remaining factors in detail.

A. The Nature of the Injury: *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*

The NFL contends that the injuries suffered by the Raiders and the Coliseum were not of a type the antitrust laws were intended to prevent, basing its argument upon *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). There, the Court denied a treble damages cause of action to a group of bowling centers, for an alleged violation of section 7 of the Clayton Act. The bowling centers suffered economic harm when Brunswick acquired, and thereby facilitated the continued operation of, a number of their financially ailing competitors. After noting that plaintiffs were in essence complaining not that Brunswick had reduced competition, but that it had actually preserved it, the Court stated that recovery could be had only for injury "that flows from that which makes defendants' acts unlawful" and that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* at 489, 97 S.Ct. at 697, *quoted in Blue Shield v. McCready,* 457 U.S. 465, 482, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982). We have stated that the *Brunswick* standard is satisfied "on a showing that the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts." *California Computer Products v. IBM,* 613 F.2d 727, 732 (9th Cir.1979).

The NFL's basic contention is that appellees never proved that their injuries were caused by the restraint of competition which flowed from the antitrust violation in this case. This argument is a curious one, and is predicated upon an unduly narrow concept of "competition."

The NFL apparently conceives of competition as something uniformly to be avoided by all rational business enterprises. The League seems to argue that the only losses of appellees which are compensable under *Brunswick* are those which require for their description some reference to the Los Angeles Rams, the other football team in the city to which the Raiders sought to relocate. Any losses merely attributable to the prevention of the relocation—attributable, that is, to the inability of the Raiders to operate in the desired regional market, and to the Coliseum's inability to lease its facility to the Raiders for their football games—supposedly do not constitute "antitrust injury" because, the NFL argues, they do not flow from the prevention of competition between the Raiders and the Rams.

We reject this effort by the NFL to restrict unduly the range of antitrust impact. "Competition," in the business context, need not, and in fact usually does not, involve any measures which expressly acknowledge, let alone take aim at, other competitors. One competes in a market merely by operating an enterprise in it. Competition, therefore, is not always dreaded by business people; indeed, it is often avidly sought by those who do not yet operate in a potentially lucrative market.

Appellants are liable for antitrust damages because they restrained competition between NFL teams and among football stadia by restraining the Raiders attempt to move and *operate* in Los Angeles. Merely by operating there, the Raiders would have been competing with the Rams, and the Coliseum would have been able to bid effectively for a professional football team as its tenant. The restraint of this competition constitutes a sufficient basis for treble damages relief under *Brunswick.*

The NFL makes much of the fact that appellees' damages claims made no reference to the Rams or to the effect that the presence of the Rams would have upon appellees' income and expenses. But any evidence of lost profits implicitly accounted for the Rams, and the NFL should have introduced contrary evidence if it felt that the presence of the Rams rendered the Raiders' or Coliseum's figures inaccurate. Moreover, the less the Rams' presence influenced the amount of appellees' lost prof-

its, the greater the indication that the football and stadium markets could have tolerated more freedom of movement for NFL teams and have functioned in an economically inefficient manner due to the territorial restrictions.

■ Finally, the NFL complains that the district court's jury instructions on this issue were insufficient. We disagree. The court expressly instructed the jury that the Raiders and the Coliseum could not recover damages unless they met their burden of proving, by a preponderance of the evidence, "that the injury was the result of a restriction in competition." *Cf. Handgards, Inc. v. Ethicon,* 743 F.2d 1282, 1296 (9th Cir.1984) (approved instruction that losses not recoverable if caused by increase in competition), *cert. denied,* — U.S. ——, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985).

### B. *Directness of the Injury (Coliseum)*

■ Appellants contend that the injury suffered by the Coliseum was connected too remotely and indirectly to the NFL's antitrust violation to be compensable under 15 U.S.C. § 15. We find this argument to be without merit.

We determined in *Raiders I* that the "claims of the Raiders and the L.A. Coliseum ... present somewhat different market considerations." 726 F.2d at 1393. Upholding the jury's liability verdict in favor of both parties, we found sufficient evidentiary support for the jury's finding that the NFL's territorial restraints in this case not only impaired competition between NFL football team franchises, but also restrained competition in the "stadia market" between rival stadia (such as the Oakland Coliseum and the L.A. Coliseum) that seek to secure NFL tenants. *Id.* at 1393–94.

Clearly, the Coliseum suffered direct harm as the result of the NFL's antitrust restraints in that latter market. Unlike the alleged injury found to be too indirect by the Court in *Associated General Contractors,* the Coliseum's injury was not filtered through "several somewhat vaguely defined links." 459 U.S. at 540, 103 S.Ct. at 910. The Coliseum was a competitor in a market in which competition was restrained directly and foreseeably, if not also intentionally. This stadium, which previously had sought to acquire the Minnesota Vikings team as a tenant, was engaged in a bidding struggle with its Oakland counterpart for the tenancy of the Raiders, and was injured when the NFL's application of its territorial restrictions foreclosed further undistorted negotiations.

We are confident that our ruling will not be misinterpreted as being a broad endorsement of antitrust standing for all parties who might have contracted with the Raiders had they not been restrained in their relocation plans. Football stadia constitute a special market distinguished from those comprised by, say, hotels, laundering establishments, or limousine services, by their indispensable and intimate connection with professional football and football teams. An injury such as that suffered by the Coliseum in the present case cannot be characterized fairly as an indirect "ripple effect."

The district court was correct in denying appellants' motion to dismiss the Coliseum's damages claim for lack of standing.

### III. DAMAGES: SUFFICIENCY OF THE EVIDENCE

As indicated above, we undertake only limited review of jury damages awards, in order to avoid encroaching upon the jury's proper function under the Constitution. The NFL launches various assaults upon the sufficiency of the evidence, but we find nothing in these to justify any interference with the damages verdicts. After examining the record in light of the NFL's contentions on appeal, we conclude that the jury's awards are supported by substantial evidence, and are neither grossly excessive nor based upon mere speculation.

■ While we do not respond explicitly to each of the NFL's many allegations of error, we do note the NFL's arguments that the Raiders and the Coliseum failed to prove the requisite causal links between the NFL's antitrust violation and certain

elements of the alleged damages. Recovery will not be permitted for injuries which have been independently caused by something other than the antitrust violation. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126–28, 89 S.Ct. 1562, 1578–79, 23 L.Ed.2d 129 (1969). However, a plaintiff need not prove that the antitrust violation was the only cause of its injury in order to recover damages under 15 U.S.C. § 15; proof that the violation was a material cause is sufficient. *Id.* at 114 n. 9, 89 S.Ct. at 1571 n. 9; *William Inglis & Sons*, 668 F.2d at 1051.

In the present case, the jury's implicit findings of causation of damages were generally supported by substantial evidence. The only possible instances where appellees' submitted damages estimates may have been unfounded because of a lack of proof of causation were: their claims for lost profits that would have been earned had luxury stadium boxes been built in the Coliseum and rented for the Raiders' 1980 football season, and perhaps also part of the Raiders' claim for the "reduced value" of a loan whose receipt was delayed as a result of the NFL's violation.

Even if we eliminate these questionable elements of appellees' claims, however, the jury had before it sufficient evidence, including the attendance and seat price estimates offered by the Raiders, on which to reach the damages amounts it awarded to both parties. Even a total inadequacy of proof on isolated elements of damages claims submitted to a jury will not undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of the evidence. If we find that a jury's damages award exceeds the maximum amount sustainable by the probative evidence, we will not hesitate to order a remission of the excess by the plaintiff or, in the alternative, a new trial. *See D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir.1982); *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 602–03 (9th Cir.1983). But where, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not "play Monday morning quarterback" and supplant the jury's evaluation of the complex and conflicting evidence with our own. *Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 80–81 (1st Cir.1984); *see, e.g., W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 219 (3d Cir.1984).

## IV. DAMAGE OFFSETTING RULE (RAIDERS)

Written by District Judge WILLIAMS with Circuit Judge NELSON dissenting.

In accordance with the analysis contained in Parts II and III of this opinion, the jury could properly have found that the amount of the Raiders' lost profits from the delay of two years in moving to Los Angeles amounted to $11,554,382. However, we conclude that the district court erred in limiting the NFL's damage offset defense, when it excluded from the jury's consideration in calculating damages the benefits the Raiders realized by taking from the NFL the opportunity to establish an expansion franchise in Los Angeles.

Two related offset theories are potentially applicable to this case. The fault-based offset theory, premised on *Perma-Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968), provides that the "beneficial byproducts" of an illegal restraint to which the plaintiff is a party should be offset against the damages incurred by plaintiff which resulted from the restraint. The second theory, which does not depend upon a plaintiff's culpability, is based on general principles of damages which limit a plaintiff's recovery under the antitrust laws to compensation for the "net" injury incurred as a result of the defendant's antitrust violation. Under this theory, in order to put a plaintiff in the position it would have been, absent the defendant's antitrust violation, the plaintiff's gross recovery for the antitrust violation must be reduced by any benefits that plaintiff would not have received had there been no anticompetitive conduct by the defendant, or, more generally, by amounts

which are unnecessary to fully compensate a plaintiff for the adjudicated violation. The relevant inquiry is "what plaintiff's situation would have been in the absence of the defendant's violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. at 566, 101 S.Ct. at 1929.

Although distinct, the two offset theories are based on the same underlying objective: avoiding overcompensation of plaintiffs through awarding damages beyond the actual extent of their injuries. The theories differ in that, under *Perma-Life*, the benefits to be offset accrued to the plaintiff *because of* its status as a party to the defendant's illegality, whereas under the second theory, the plaintiff's role is essentially irrelevant. The court's task under the latter theory is to award damages to put the plaintiff into the position it would have been, absent the antitrust violation. This requires a deduction for benefits that would not have accrued to plaintiff in the absence of the violation, or for claimed damages which exceed the scope of the defendant's liability. The parties' briefs do not clearly distinguish between these two types of offsets, apparently treating them as one. However, because the two theories differ in their application, we examine them separately in order to apply them correctly to this case.

The *Perma-Life* offset arises where the plaintiff was a party to the defendant's antitrust violation. In such situations, the "beneficial byproducts of a restriction [of competition] from a plaintiff's point of view" are to be offset against the plaintiff's damages resulting from the restraint. *Perma-Life*, 392 U.S. at 140, 88 S.Ct. at 1985. In *Perma-Life*, the Court held that a plaintiff's participation in the defendant's antitrust violation could not constitute a total bar to liability for the violation, under the equitable doctrine of *in pari delicto*. Rather, the court stated, the benefits realized by the plaintiff from the restraint should be deducted from plaintiff's gross antitrust damages in order to arrive at the amount representing the extent of plaintiff's actual (net) injury from the illegal restraint. *Id. See, e.g., Kestenbaum v.*

*Falstaff Brewing Corp.*, 514 F.2d 690, 695 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), II P. Areeda & D. Turner, *Antitrust Law* at 255 (1978).

The second, non-fault based offset theory is simply a corollary of the general principle, applicable outside the antitrust context, that an award of damages should put a plaintiff forward into the position it would have been "but for" the defendant's violation of the law. A plaintiff's antitrust damages are to be calculated "by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). *Accord, J. Truett Payne*, 451 U.S. at 566, 101 S.Ct. at 1929. The inquiry involves a comparison of "the plantiff's actual situation with the hypothetical situation that would have existed in the absence of the violation." II Areeda & Turner, *supra* at 229. Under this theory, the ultimate relief awarded must take into account any benefits which would not have been received by plaintiff "but for" the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation. An antitrust plaintiff may recover only to the "net" extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.

This principle is aptly illustrated by the case of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which affirmed a district court's reduction of damages by the amount the plaintiff would have been required to expend in the absence of defendant's illegal restraint of trade. In *Hanover Shoe*, the defendant's practice of leasing and refusing to sell its more complicated and important shoe machinery was found to be an illegal act of monopolization. Because the plaintiff would have bought rather than leased the

machinery from the defendant had it been given the opportunity to do so, the Court offset against the plaintiff's gross antitrust damages (the rental price paid for leasing the machines) the amount plaintiff would have paid to purchase the machines absent the "lease-only" restraint of trade. *Id.* at 487, 88 S.Ct. at 2228. This same offset principle was also applied later in the opinion, when the Court affirmed the district court's deduction from antitrust damages of the cost of capital that the plaintiff would have incurred had it been able to purchase defendant's machines. Because of defendant's illegal insistence on leasing rather than selling its product, plaintiff was able to avoid the capital cost it would have incurred in buying the machines (the interest rate at which it would have been able to obtain the capital to purchase the machines). *Id.* at 503–04, 88 S.Ct. at 2236–37. Placing plaintiff in the position it would have been, absent the antitrust violation, thus required deducting from gross damages the amounts plaintiff would have expended if defendant had been willing to sell the machinery to plaintiff.

This netting rule reflects the more general requirement that an antitrust plaintiff recover only for "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). Under *Brunswick,* the essential inquiry is whether the damages sought by the plaintiff are for injuries which flow from the defendant's anticompetitive conduct. Relief which is beyond the scope of an adjudicated antitrust violation may not be awarded. As shall be discussed in more detail below, just as it is necessary to deduct from a gross damage recovery the benefits a plaintiff would not have received absent an antitrust violation, the *Brunswick* rule re-

quires that the gross relief awarded for an antitrust violation be offset by amounts which are not attributable to the defendant's illegal conduct. A "plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne,* 451 U.S. at 562, 101 S.Ct. at 1927.

Determining how these offset mechanisms apply to the facts of this case depends in part upon which of two alternative interpretations of the liability verdict, relating to the precise nature of the NFL's antitrust violation, are correct. The first alternative, proposed by the NFL, construes the liability jury's general verdict in favor of the Raiders as a finding that Rule 4.3 *by itself* was an illegal restraint of trade. The second alternative, urged by the Raiders, construes the verdict to have found Rule 4.3 invalid only as it was applied to prevent the Raiders from moving from Oakland to Los Angeles. Both the NFL and the Raiders appear to assume that a decision between these alternatives will necessarily determine the larger question of whether the district court erred in limiting the NFL's offset defense. However, as the discussion below demonstrates, the NFL's offset evidence was improperly restricted by the district court under *either* interpretation of the verdict. Each alternative will be considered in turn.[1]

### A. *Alternative I: Rule 4.3 Illegal by Itself*

Assuming first that Rule 4.3 by itself was found by the liability jury to have been illegal, then the Raiders, by virtue of their participation in the continued existence of Rule 4.3 during their years in the NFL, were parties to that restraint along with the other NFL clubs, at least until the Raiders challenged the rule in 1980. If the Raiders were parties to the restraint, a straightforward application of the *Perma-*

---

**1.** Because the two views of the verdict ultimately lead to a divergence with respect to the amount of the Raiders' benefits that should be offset against their damages, it is necessary to decide which interpretation of the liability ver-

dict is correct. *See infra* at 1369. However, we discuss both alternatives in order to more clearly illustrate the parameters of the two offset theories at issue in this case.

*Life* rule would require all benefits accruing to the team from Rule 4.3's territorial restrictions to be offset against their damages. The NFL's offer of proof with regard to the offset defense noted three types of benefits that the Raiders received from Rule 4.3 over the years: (1) increased television revenues because of the stable geographic dispersal of franchises, (2) benefits from the Oakland community due to the seeming stability fostered by Rule 4.3, and (3) the preservation of the Los Angeles expansion opportunity which the Raiders eventually moved into.

We can see no principled argument that could preclude application of the *Perma-Life* rule to the facts of this case, given the assumption that the liability verdict found Rule 4.3 to be illegal over the years the Raiders belonged to the NFL. If Rule 4.3 was illegal and the Raiders were a party to that illegality, then the benefits flowing to the Raiders from that restriction on competition would have to be offset against the Raiders' damages to the full extent proposed by the NFL. Accordingly, were we to adopt the NFL's construction of the jury's liability verdict, the *Perma-Life* theory would require that we vacate the district court's damage award and remand for consideration of the amount of the benefits received by the Raiders that should be offset against their lost profits.[2]

**B.** *Alternative II: Rule 4.3 Illegal Only as Applied to Raiders' Move*

■ Although the above-described interpretation of the verdict is plausible, it is ultimately inconsistent with the actual history of this case. The Raiders' construction of the verdict—that Rule 4.3 was found to be invalid only as it was applied to the Raiders' proposed move to Los Angeles—finds much greater support in the

record than does the NFL's version. The liability jury was instructed that "the overriding issue you are asked to decide is whether Rule 4.3 as applied to this case is an unreasonable restraint of trade under Section 1 of the Sherman Act." 32 Tr.2d 7211.[3] Moreover, while the evidence heard by the liability jury could support either construction of the verdict, it is consistent with the principles of res judicata to interpret the verdict to have decided only what was necessary to have reached its general verdict for the Raiders. In concluding as it did, the jury need not have reached the broad issue of the legality of Rule 4.3 by itself; they need only have found it invalid as it was applied to the Raiders' move. Such an interpretation of the verdict is consistent with that of the trial judge, who indicated his agreement in so limiting the final equitable decree permitting the Raiders to move to Los Angeles.[4] Moreover, we affirmed the liability judgment in *Raiders I* only after examining the particular anticompetitive conduct and markets involved in the circumstances of the Raiders' contemplated move. *See Raiders I* at 1395–98. Accordingly, we find that the Raiders' interpretation of the liability verdict is correct, and thus construe the verdict to have held Rule 4.3 invalid only as it was applied to the Raiders' proposed move to Los Angeles. We therefore analyze this second alternative in greater detail, below.

If, as we have decided, Rule 4.3 was not illegal until it was applied to the Raiders' move, then the Raiders were not a party to an illegal restraint over the years, and the benefits accruing to them by reason of that restraint were not the beneficial byproducts of an antitrust violation. Therefore, the fault-based *Perma-Life* theory simply could not be applied to offset the benefits received by the Raiders over the years

---

**2.** Because the *Perma-Life* theory would require such an offset, it would be unnecessary to inquire into the effect of the *Hanover Shoe* type of offset under this interpretation of the verdict.

**3.** "T.R.2d" refers to the reporter's transcript of the second liability trial and damages trial. "C.R." identifies documents contained in the dis-

trict court record, listed by the docket numbers assigned by the Clerk of that court.

**4.** Final Decree, C.R. 2090 (June 14, 1982). The trial judge rejected the broad decree sought by the Raiders, which would have prohibited the NFL from enforcing Rule 4.3 in any form or context. *See* C.R. 2073.

from Rule 4.3. However, application of the *Hanover Shoe* offset mechanism in light of this construction of the liability verdict provides a quite different outcome.

As indicated above, the *Hanover Shoe* offset rests on the principle that, to put the plaintiff into the position it would have been, absent the defendant's antitrust violation, benefits that would not have been received by the plaintiff had there been no violation, or amounts which represent a recovery beyond the scope of the adjudicated antitrust liability, must be offset against the gross relief awarded. This offset principle has been applied in a variety of antitrust cases, both in this Circuit and elsewhere.

In the seminal case of *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972), the defendant franchisor was found to have illegally tied the sale (to its franchisees) of equipment and supplies, to the licensing of defendant's "Chicken Delight" trademark. The defendant did not charge its franchisees (the plaintiffs) directly for the use of the trademark, but instead required the purchase of the equipment and supplies as a condition of the use of the trademark. The district court awarded as damages for this illegal tying arrangement the full amount plaintiffs were overcharged for the tied items (the equipment and supplies). This court reversed the damage award, holding that the gross damage amount should have been offset by the "reasonable value [of] the Chicken Delight license." *Id.* at 52. In other words, in order to put the plaintiffs into the position they would have been, absent the illegal tie, the overcharges on the tied items should have been reduced by the amount plaintiffs would have paid for the license in the absence of the unlawful restraint. This court's decision was simply a recognition of the fact that if the defendant had not required the purchase of the equipment and supplies, it would have (legally) charged plaintiffs for the right to use the trademark. Plaintiffs were not entitled to both their damages from the overcharges on the tied products *and* access to

the typing products free of charge. Rather, we directed that the plaintiffs' damage award be reduced by the amount plaintiffs would have paid for the use of the trademark, in the absence of the antitrust violation. As we stated, "the cost or value of the products involved, free from the unlawful arrangement, must first be ascertained." *Id.* See also *Burlington Industries, Inc. v. Milliken & Co.*, 690 F.2d 380, 385–86 (4th Cir.1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983) (offsetting against plaintiff's gross damages "the amount which plaintiffs would have paid ... in the absence of the royalty-maintenance conspiracy").

This offset mechanism may also be utilized to reduce a damage award where a portion of that award includes damages which go beyond the scope of adjudicated antitrust liability. Consistent with *Brunswick*, any damages awarded must be attributable to conduct which violated the antitrust laws. Where a plaintiff's recovery flows from conduct which has been found to be legal in part and illegal in other respects, *Brunswick* requires that the award be reduced to reflect a recovery only for that conduct found to be illegal under the antitrust laws. Thus, in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), the district court's damage award included a recovery not only for the defendant's anticompetitive actions, but also for certain of its practices that were legal. The Second Circuit reversed, holding that the damage recovery should have compensated the plaintiff only for that portion of the defendant's conduct which was found to be illegal. The court emphasized that the Sherman Act does not require a party "whose position has for the most part been attained legitimately ... to forfeit all fruits of its success because its power has merely been supplemented by improper conduct." *Id.* at 298. Similarly, in *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78

L.Ed.2d 226 (1983), the plaintiff premised its damage study on conduct of the defendant that was later found to be partially lawful and partially anticompetitive, and provided no means for the jury to separate out damages resulting from the illegal conduct. The Seventh Circuit vacated the resulting damage award, requiring that the award be limited to "the *illegal* practices of the defendant." *Id.* at 1161 (emphasis in original). "To allow otherwise would force a defendant to pay treble damages for conduct that was determined to be entirely lawful." *Id.* at 1162–63. *Accord, ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 434 (N.D.Cal.1978), *aff'd sub. nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980) (per curiam), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981), *Allegheny Pepsi-Cola v. Mid-Atlantic Coca Cola,* 690 F.2d 411, 415 (4th Cir.1982), *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1353 (3d Cir.1975).

In light of these authorities, it becomes our task to compare the relative positions of the parties, before and after the application of Rule 4.3, in order to reconstruct what the Raiders' position would have been in the absence of the NFL's antitrust violation. We thus must determine whether any benefits were received by the Raiders that would not have belonged to them had Rule 4.3 not been improperly applied to their contemplated move to Los Angeles, or whether the relief awarded extends beyond the scope of the antitrust liability found by the jury.

Prior to 1980, the NFL as a whole owned the right to expand into the Los Angeles area. As evidence at both phases of the trial in this case demonstrated, the Los Angeles opportunity represented an extremely valuable expansion possibility for the league. *See* Stanford Research Institute Study (Plaintiff's Exhibit 48). The value of the Los Angeles opportunity arose not only from the economic potential of one of the nation's largest media markets, but also from the NFL's well-established and widely followed nationwide entertainment product. That product had developed over the years into a geographically diverse structure of teams, with traditions, rivalries, well-known players and national media interest, all of which greatly enhanced the value of any expansion opportunity. If and when the NFL placed an expansion team in the Los Angeles area,[5] the accumulated value of the Los Angeles opportunity would have been realized by the NFL through charging the new expansion team owner for the expansion opportunity. *See, e.g.,* 16 Tr.2d 3148–49.

As indicated above, the value of the league's expansion opportunities belonged to the league as a whole, or in other words, was owned in part by each franchise owner. Unquestionably, when the Raiders moved to Los Angeles, they appropriated for themselves the expansion value that had accumulated in Los Angeles. Although by moving out of Oakland the Raiders "gave back" an expansion opportunity to the NFL, the uncontradicted testimony at trial showed the Los Angeles market to be a significantly more lucrative franchise opportunity. Indeed, the Raiders' managing general partner, Al Davis, testified that the Raiders increased their value by some $25 million by moving to Los Angeles. 26 Tr.2d 5562, 59 Tr.2d 11578. *See also* 16 Tr.2d 3115.

If, as the Raiders contend and we have found, the jury decided that Rule 4.3 was illegal only as it was applied in 1980, then the NFL's development of the Los Angeles expansion opportunity until 1980 cannot be said to be illegal in the eyes of the antitrust laws. Thus, at least as far as the law of this case is concerned, the NFL legitimately possessed the value of that expansion opportunity that had accrued until 1980. (Note that if the jury *had* found the NFL's development of the Los Angeles opportunity through 1980 to be illegal, the Raiders, as a party to that illegality, would then have been fully subject to the *Perma-Life* offset. *Supra* at 1368.) By finding that the NFL violated the antitrust laws

---

5. The Rams, by this time, were playing in Anaheim.

through its application of Rule 4.3 in 1980, the liability verdict gave the Raiders only the right to play football in Los Angeles from 1980 forward. Because the verdict did not find Rule 4.3 illegal over the years, it did not mandate an award to the Raiders of the value of the Los Angeles opportunity that had accumulated prior to 1980. The verdict did entitle the Raiders to the right to play in Los Angeles on into the indefinite future, and to damages for lost profits from the two years the Raiders remained in Oakland after the NFL improperly refused to permit their move. However, because the NFL's cultivation of the Los Angeles opportunity until 1980 was not found to violate the antitrust laws, an award of that opportunity to the Raiders would constitute a recovery for conduct of the NFL which was not found to be illegal. Under *Brunswick*, the accumulated value of that business opportunity is not something to which the Raiders became entitled as a result of the liability verdict. As a result, the injunction permitting the Raiders to play NFL football in Los Angeles provided them with a windfall benefit beyond the scope of the antitrust verdict.

Although this overbroad injunctive relief may have been appropriate because such an equitable remedy was at the core of this litigation, the principles of *Brunswick* and *Berkey Photo* require that this windfall be taken into account when awarding *additional* damages beyond the injunctive relief. Specifically, the Raiders' additional damage award (for lost profits from the two years the NFL prohibited their move to Los Angeles) should be offset to the extent their injunctive relief exceeded the scope of the antitrust verdict. As the situation stands pending this appeal, the Raiders have been awarded both the portion of the Los Angeles opportunity that had been legitimately possessed by the NFL, and additional monetary damages. To limit the Raiders' recovery to their injury flowing from the NFL's adjudicated violation, it is necessary to offset the Raiders' damage award against the excess portion of the injunctive relief, until that excess is fully exhausted. Then, and only then, may additional monetary damages be awarded consistent with *Brunswick* and its progeny. To do otherwise would in effect permit the Raiders to recover for conduct of the NFL that did not violate the antitrust laws. To paraphrase *Berkey Photo*, "instead of being required simply to compensate [the plaintiff] for the consequences of its wrongful action, [the NFL] would be required to forfeit its legitimately acquired advantage." 603 F.2d at 298.

Rather than remand for an entirely new trial on the question of damages, as was necessary in *Berkey Photo* and *MCI*, it is possible in this case to utilize the jury's calculations of gross damages as a component of the damage-netting mechanism exemplified in *Hanover Shoe* and *Siegel*. Because the Raiders' gross damages from their two year delay in moving to Los Angeles have been, as we have found, properly determined, the remaining task for the district court on remand will be to calculate the value of the Raiders' injunctive relief that exceeded the scope of the liability verdict, and offset that value against the Raiders' monetary award. As indicated above, the excess portion of the injunctive relief can be measured as the value of the NFL's Los Angeles expansion opportunity in 1980, prior to the NFL's illegal conduct, less the value of the Oakland opportunity returned to the league.

Another way of looking at the application of this offset to the facts is through a comparison of the Raiders' actual situation "with the hypothetical situation that would have existed" had there been no antitrust violation. II Areeda & Turner, *supra*, at 229. As indicated above, it was the NFL's customary practice to charge owners of new franchises for the expansion opportunity received. The price charged new franchisees reflected the value of the expansion opportunities being provided. For instance, the price charged for an expansion team doubled in the years from 1966 to 1976, from $8.5 million to $16–17 million.[6]

---

**6.** 16 Tr.2d 3010; *Antitrust Policy and Profession-* *al Sports: Hearings on H.R. 823, H.R. 3287, and*

If the NFL had voted in favor of the Raiders' move to Los Angeles in 1980, it would have been justified in imposing an analogous charge on the Raiders to account for the excess value of the Los Angeles opportunity the Raiders were receiving over the "Oakland opportunity" that was being returned to the league. In other words, the amount of compensation sought by the NFL might reasonably have reflected the difference between what it could have obtained from a new franchisee in Los Angeles, and a new franchisee in Oakland. In the absence of the NFL's antitrust violation, the Raiders would have been playing football in Los Angeles, but would have been required to compensate the NFL for the excess value of the Los Angeles opportunity.

Application of this offset rule is consistent with, and indeed, virtually compelled by, this court's *Raiders I* opinion. In analyzing the "unique" nature of professional athletic leagues vis-a-vis the antitrust laws, this panel expressly acknowledged that "the nature of NFL football requires some territorial restrictions in order both to encourage participation in the venture *and to secure each venturer the legitimate fruits of that participation.*" *Raiders I* at 1396 (emphasis added). Here, the league owners collectively possessed the value that had accumulated in the Los Angeles expansion opportunity. This value, as indicated above, was created at least in part through the NFL's development, over the years, of a popular spectator sport with a national following. Although this panel upheld the liability jury's conclusion that Rule 4.3 as it was applied to the Raiders' move was an unreasonable restraint of trade, the opinion noted several less onerous forms of territorial restrictions that could pass muster under the rule of reason. Among these were standards restricting team movement that

expressly recognized certain objective factors such as population, economic projections and the like, that the league could legitimately consider in deciding whether to permit a team to move. *Id.* at 1397. If such restrictions, applied in a non-arbitrary manner, would be reasonable under the Sherman Act, then *a fortiori*, a rule requiring merely an objectively-determined payment to league members as compensation for the right to take a valuable, jointly-owned franchise opportunity out of the league's hands, would also be a reasonable restriction.

Thus, by taking possession of the Los Angeles expansion opportunity from the NFL, the Raiders reaped a windfall benefit beyond the scope of the antitrust verdict. For this reason, and also because the NFL, in the absence of its antitrust violation, would have been justified in requiring the Raiders to compensate the NFL for the excess value represented by the Los Angeles expansion opportunity,[7] that excess value should have been offset against the Raiders' lost profits from the two years they were precluded from moving to Los Angeles. The district court therefore erred in refusing to admit evidence of the full benefits of the Los Angeles expansion opportunity received by the Raiders, and in refusing to instruct the jury on the NFL's offset defense. The court incorrectly limited the NFL's offset evidence in this regard to the "negotiating advantage" the Raiders received during the 1980–82 period by virtue of the fact that Rule 4.3 discouraged other teams from moving to Los Angeles during that period. On remand, the scope of the offset should be broadened to include the full value of the Los Angeles opportunity that had accrued prior to 1980, less the value of the "Oakland opportunity" that was returned to the NFL.

*H.R. 6467 Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 97th Cong., 1st & 2d Sess. 276 (1981–82).

**7.** In footnote 1 of her dissenting opinion, Judge Nelson suggests that our offset analysis is dependent upon an assumption that the NFL

would have charged the Raiders for the excess value represented by the Los Angeles opportunity. However, this assumption is raised only as an alternative to our primary holding, that the relief awarded the Raiders is beyond the scope of the adjudicated antitrust liability, and for that reason should be offset.

The district court was correct, however, in refusing to admit evidence of the other benefits the NFL sought to offset against the Raiders' damages. The increased television revenues attributable to Rule 4.3, as well as the benefits received from the Oakland community over the years as a result of Rule 4.3, are benefits that would have accrued to the Raiders even if Rule 4.3 had not been illegally applied to prevent the Raiders' move to Los Angeles. For the same reason, these benefits do not represent a windfall recovery beyond the scope of the antitrust verdict. Placing the Raiders in the position they would have been, absent the NFL's improper application of Rule 4.3, does not require deduction of these benefits from the Raiders' gross damages.

Although the Raiders protest that any offset of their damages is inconsistent with the policy of the antitrust laws to encourage private lawsuits, it is beyond dispute that the Sherman Act was not intended to provide recoveries, before trebling, in excess of the injuries that were actually caused by an antitrust violation. *Brunswick*, 429 U.S. 477, 97 S.Ct. 690. Moreover, even assuming that their award of monetary damages will be wholly offset, there is nothing necessarily wrong with "a damage assessment producing no net recovery," where that is a "result commanded by the necessity of offsetting injuries which plaintiffs may have suffered at the hands of defendants with benefits which they may have derived from the very activities they attack." Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127, 1136 (1976). *See also* II Areeda & Turner, *supra* at 257 (prospect of injunctive relief is the appropriate incentive for plaintiff to bring suit when antitrust "damages cannot be awarded [because] they don't exist"). As indicated above, by moving to Los Angeles the Raiders received not only what the liability verdict entitled them to—the right to play football in Los Angeles from 1980 forward—but also the windfall benefit of the Los Angeles expansion opportunity that had legitimately belonged to the NFL as a whole prior to 1980. In order to accurately calculate the Raiders' net injury from the antitrust violation, their lost profits from 1980–82 must be reduced by the value of the injunctive relief awarded by the district court which exceeded the scope of the liability verdict. No case cited by the Raiders stands for the proposition that encouragement of antitrust suits requires a damage recovery (before trebling) to go beyond the extent of the plaintiffs' actual injury.

Similarly, we are not persuaded that antitrust policy requires that the offset amount be deducted from an already trebled gross damage award. Rather, as in *Siegel* and *Hanover Shoe*, the reduction should occur prior to trebling. An antitrust plaintiff is entitled to a trebled recovery, but only treble the amounts which are necessary to compensate it for the injury caused by the defendant's violation. The plaintiff's damages consist of either its lost profits caused by the antitrust violation or the value of the business that it is deprived of by the defendant's illegal conduct. One injured by an antitrust violation may not recover both measures of relief, because the value of the business "necessarily take[s] into consideration its future profit-earning potential." *Albrecht v. Herald Co.*, 452 F.2d 124, 129 (8th Cir.1971). To award both future profits and the value of the business at the time of the violation would constitute a double recovery. *Id.* at 131, II Areeda & Turner, *supra* at 234.

As we have construed it, the liability verdict in this case entitled the Raiders only to the stream of profits that could be earned in Los Angeles beginning in 1980; it did not entitle them to the *value* of the Los Angeles expansion opportunity (the "value of the business") that had been legitimately possessed by the NFL. The monetary damage award gave them their profits from 1980–82, and the injunction covered their profits from 1982 forward. However, the injunction also gave them the "value of the business"—the excess value of the Los Angeles opportunity for which the NFL could have legitimately charged them. Thus, the combination of the injunc-

tion and monetary damages provided the Raiders with *both* the "lost profits" and the "value of the business" measures of relief.

Pending this appeal, then, the Raiders have been awarded double the compensatory relief to which they are entitled. In order to treble only a single measure of compensatory relief, this double recovery must be corrected before trebling; to do otherwise would in effect treble an incorrect measure of relief. Given the injunction that has already been awarded, the proper measure of compensatory relief in this case consists of the value of that injunction, plus whatever monetary damages are necessary to compensate the Raiders for the antitrust injury which is not redressed by the injunctive relief. To reach this monetary figure, the compensatory relief already received (i.e., the injunction, which includes the amount to be offset) must be deducted, *before* trebling, from the total compensatory recovery to which the Raiders are entitled. The resulting monetary amount combined with the injunction will fully compensate the Raiders for their injury, representing a *single* correct measure of compensatory relief. It is the monetary component of this overall recovery which should then be trebled.[8]

In sum, either of two scenarios are possible. If Rule 4.3 was illegal by itself, over the years, then the Raiders, as a party to that restraint, would have their damage award offset under a direct application of the *Perma-Life* rule. If Rule 4.3 was not illegal over the years, then the Raiders were not party to an illegal restraint through 1980; however, in that case, neither would the NFL's conduct through 1980 have been illegal. Because we have determined that Rule 4.3 was found to be invalid only as it was applied to the Raiders' proposed move in 1980, the NFL's pre-1980 conduct is not something for which a recovery may be had under the antitrust laws. Under these circumstances, a portion of the Raiders' injunctive relief included the value of the NFL's Los Angeles opportunity that had legitimately accrued to the NFL through 1980, a recovery which did not "flow ... from that which [made] defendants' acts unlawful." *Brunswick* at 489, 97 S.Ct. at 697. The Raiders' additional monetary damages must be offset to the extent the injunctive relief went beyond the scope of the adjudicated antitrust violation.

## CONCLUSION

We reverse the district court's denial of the NFL's motion for judgment n.o.v. on

---

8. Judge Nelson asserts that our calculation of damages improperly omits the "residual" value of the difference in worth between the Los Angeles and Oakland opportunities (the "b" value from *Hanover Shoe*). To the extent that our decision is based on the hypothetical "outlay" of the Raiders to obtain the benefits of moving to Los Angeles (*see* footnote 7), there is simply no "residual" value present in this case which is analogous to the "b" value in *Hanover Shoe*.

In *Hanover Shoe*, it was appropriate to reduce "a", the expenditures the plaintiff was able to avoid because of defendant's insistence on leasing the shoe machinery, by the portion of "a" which remained in plaintiff's hands at the conclusion of the damage period (*i.e.*, "b", the residual value of the machines). This was because "a" by itself did not accurately reflect the plaintiff's actual outlay to purchase equipment; plaintiff's *net* outlay was the initial purchase price less the value of the machinery remaining in plaintiff's hands at the conclusion of the damage period. We can see no similar residual value remaining in the Raiders' hands as of 1982. The "residual value" identified by Judge

Nelson, the difference between the 1982 values of the Los Angeles and Oakland opportunities, does not represent any value retained by the Raiders from their hypothetical outlay to acquire the Los Angeles opportunity. There is thus no reason to subtract that value from "a" to arrive at the Raiders' net outlay. To the extent that the 1982 value of the Los Angeles opportunity is relevant at all, it pertains to the question of the increase in value of that opportunity from 1980–82. That issue is dealt with in the following paragraph.

Judge Nelson also suggests that our analysis fails to take into account the extent to which the value of the Los Angeles opportunity increased from 1980 to 1982, relative to the value of the Oakland opportunity. On the contrary, this value is encompassed in the injunction awarded by the district court, which provided the Raiders with the *full* value of the Los Angeles opportunity as of 1982. Note that the increase in value of that opportunity from 1980 to 1982 is awarded by way of the jury's calculations of lost profits for those years.

the Raiders' good faith and fair dealing claim, and remand so that the damages award on that claim can be vacated. As for the Raiders' and Coliseum's antitrust awards, we affirm the trebled damage verdict in favor of the Coliseum, but vacate the Raiders' antitrust damage recovery, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART and REMANDED.

NELSON, Circuit Judge, dissenting from Part IV:

I respectfully dissent from Part IV of this opinion.

I believe that the majority misconstrues *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), when it offsets, before trebling, the 1980 value of the Los Angeles opportunity less the 1980 value of the Oakland opportunity.[1] In so doing, it improperly collapses the two separate and distinct tasks of this court: (1) assessing the damages suffered by the Raiders as a result of the NFL's antitrust violation; and (2) compensating the NFL for the benefit conferred upon the Raiders by the district court's injunction. In Section IA of this dissent, I show precisely where the majority errs, and how we should properly assess antitrust damages. In Section IB, I emphasize my agreement with the majority's conclusion that *Perma-Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), does not apply to this case. In Section II, I set forth what I believe is the correct method for compensating the NFL.

---

**1.** The majority's assessment of damages rests upon an assumption, neither pleaded nor proved by the NFL, that the League actually would have charged the Raiders the difference between the 1980 values of the Los Angeles and Oakland opportunities. I base much of my dissent on the same assumption, but note that I would require the NFL to plead and prove that fact on remand.

## I. The Raiders' Antitrust Damages

### A. The Majority Misapplies *Hanover Shoe* by Omitting a Crucial Element of the Damages Formula Upheld by the Supreme Court

In purporting to apply *Hanover Shoe* to the calculation of the Raiders' damages, the majority concludes that it is necessary and sufficient to treble the difference between the Raiders' lost profits between 1980 and 1982 on the one hand, and the 1980 value of the Los Angeles opportunity minus the 1980 value of the Oakland opportunity on the other. I disagree. It is my view that damages resulting from the unlawful restraint include all lost financial advantages, including profits and the accrued value of the business.

In *Hanover Shoe*, United's insistence upon renting rather than selling its machines was deemed a violation of the antitrust laws. Absent the violation, Hanover would have incurred no rental costs, but would have expended money in purchasing and servicing its own machines. Yet, in calculating pre-trebled damages, the district court did not simply deduct from Hanover's rental costs the purchase price and maintenance costs of the machines. Instead, it deducted the *difference* between the purchase price and maintenance costs on the one hand, and the residual value of the machines at the end of the damage period on the other. 245 F.Supp. 258, 287 (M.D.Pa.1965). That is, in order to arrive at a proper assessment of damages, the court deducted from Hanover's rental costs the *net* outlay the company would have had to make in securing the financial advantages of purchased machines. The district court's pre-trebled assessment of damages

---

In this connection, I am puzzled by the majority's contention that its so-called "primary" holding does not assume that the NFL would have charged the Raiders for the move. *See ante* at n. 7. If the NFL would not have charged the Raiders for the move, I see no way that the relief awarded could have been considered beyond the scope of the adjudicated antitrust liability.

may be reflected algebraically, by the formula $D = R - (a - b)$, where:

"D" = pre-trebled damages;

"R" = total rents and royalties paid by Hanover during the complaint period;

"a" = the purchase price to Hanover of the machines it would have bought in 1939 (the beginning of the complaint period) or in any subsequent year when additional machines or replacement machines would have been acquired, plus the expenses Hanover would have incurred in servicing those machines;[2] and

"b" = the residual value of (1) machines deemed to have been disposed of at the end of an assumed life expectancy, and (2) machines on hand in September, 1955 (the date of the commencement of the action).

245 F.Supp. at 287–89. The Supreme Court affirmed this assessment. 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

The majority opinion on damages *ignores* component "b". If, as the majority effectively concludes, "a" is the 1980 difference in worth between the Los Angeles and Oakland opportunities, then "b" must be the 1982 (*i.e.*, "residual") value of the difference in worth between the opportunities. Applying the *Hanover Shoe* rationale here, in order to reflect accurately the net outlay that the Raiders would have had to make in securing the financial advantages of the

move to Los Angeles, we should deduct from lost profits not "a", but the *difference* between "a" and "b". That is, rather than trebling $[R - a]$ as the majority does, we should treble $[R - (a - b)]$ where:

"R" = lost financial advantages between 1980 and 1982;

"a" = the 1980 value of the Los Angeles opportunity minus the 1980 value of the Oakland opportunity; and

"b" = the 1982 value of the Los Angeles opportunity minus the 1982 value of the Oakland opportunity.

In failing to account for the 1982 (*i.e.*, "residual") value of the difference in worth between the Los Angeles and Oakland opportunities,[3] the majority underestimates the Raiders' damages.[4]

Beyond its failure to calculate properly the net outlay the Raiders would have been required to make in moving to Los Angeles in 1980 and operating there through 1982, the majority also fails to calculate properly the financial advantages the Raiders lost by virtue of not being able to move in 1980.[5] The antitrust laws provide for the trebled recovery of *all* financial advantages the plaintiff would have gained absent the unlawful activities of the defendant. *See Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). Consistent with that principle, the Raiders'

---

**2.** For the sake of clarity, I have taken what the district court in *Hanover Shoe* called "S" (expenses Hanover would have incurred in servicing the purchased machines) and incorporated it into "a".

**3.** In its footnote 8, the majority offers no support for the contention that the difference in worth between the Los Angeles and Oakland opportunities has no "residual" value in 1982. Indeed, by deducting the 1980 value of the Oakland opportunity from the 1980 value of the Los Angeles opportunity before offsetting, the majority implicitly acknowledges that the Oakland opportunity had a "residual" value in 1980. Following the majority's reasoning, I find it inexplicable *that the Los Angeles opportunity would not similarly possess a "residual" value in 1982.*

  In the majority's own words:
  Unquestionably, when the Raiders moved to Los Angeles, they appropriated for themselves the expansion value that had accumulated in

Los Angeles. Although by moving out of Oakland the Raiders "gave back" an expansion opportunity [*i.e.*, a residual value] to the NFL, the uncontradicted testimony at trial showed the Los Angeles market to be a significantly more lucrative franchise opportunity.

*Ante* at 1371. In short, the majority's footnote 8 is inconsistent with its own offset calculation in the body of the opinion.

**4.** That is to say, the majority overestimates the net outlay $(a - b)$ the Raiders would have had to make in securing the financial advantages of the Los Angeles opportunity from 1980 to 1982.

**5.** Here, I am referring to all lost financial advantages other than the increase in the value of the opportunities as reflected in the calculation of "a" and "b".

pre-trebled recovery should reflect not only the lost profits from 1980 to 1982, but also the extent to which the increase in value of the business during the same period would have been greater in Los Angeles than it actually was in Oakland.[6]

In *Fishman v. Estate of Wirtz*, 594 F.Supp. 853 (N.D.Ill.1984), a case strikingly similar to our own, the plaintiff was unlawfully precluded from purchasing a sports franchise. The district court included in pre-trebled damages both lost profits *and* the increase in the value of the business during the period of the violation.[7] Similarly, in *Magnus Petroleum Co. v. Skelly Oil Co.*, 446 F.Supp. 874 (E.D.Wis.1978), *rev'd on other grounds*, 599 F.2d 196 (7th Cir.), *cert. denied*, 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 191 (1979), the district court allowed a corporation which had been unlawfully prevented from acquiring a business to recover three times the sum of both profits lost from the date of the attempted acquisition to the date of trial, *and* the increase in the value of the business' good will during that same period. 446 F.Supp. at 882–83. *See also Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (antitrust plaintiff's damages include both (1) the difference between the profits actually realized by the injured party and the profits it would have realized but for the unlawful acts complained of; *and* (2) the diminished value of its business as a result of such acts); *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 958–59 (10th Cir.1959) (same), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); *Photovest Corp. v. Fotomat Corp.*, 1977–1 Trade Cases (CCH) ¶ 61,529 (S.D.Ind.) (assessing pre-trebled

damages of profits lost during antitrust violation *plus* difference between what business would have been worth absent a violation and what it was actually worth at end of damage period), *aff'd in relevant part*, 606 F.2d 704 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *Atlantic City Electric Co. v. General Electric Co.*, 226 F.Supp. 59, 61 (S.D.N.Y.1964) (antitrust plaintiff entitled to recover lost profits *and* lost value of investment), *appeal denied*, 337 F.2d 844 (2d Cir.1964).

Perhaps the point is best illustrated by supposing that the Raiders had moved to Los Angeles in 1980, and then realized the appreciation in value of their business by selling the franchise in 1982. The financial gain attributable solely to the move would be: (1) the difference between the profits they made in Los Angeles from 1980 to 1982 and those they would have made in Oakland during the same period; and (2) the extent to which the increase in value of the business from 1980 to 1982 was greater than what the increase in value of the business would have been had they remained in Oakland. The majority ignores the second of the two financial advantages the Raiders would have secured by moving to Los Angeles in 1980 and operating there through 1982.

### B. *Perma-Life* Does Not Apply To This Case

I agree with the majority that *Perma-Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), simply does not apply to this case. The majority correctly concludes that the jury found Rule 4.3 illegal

---

**6.** Contrary to the majority's assertion in footnote 8 of its opinion, it is not at all apparent that the jury's award included both elements of damages.

**7.** In arriving at its assessment of pre-trebled damages, the court actually calculated the net value of the business as of the time of trial, added the monies distributed to the conspirator's stockholders during the violation period,

and then subtracted the monies expended by its stockholders during that time. 594 F.Supp. at 861. Because the difference between monies expended and distributed accounts for both the price the plaintiff would have paid for the franchise when it was sold to the conspirator, and its net profit or loss during the violation period, the court's calculation of damages was exactly as I propose here.

only as applied to the Raiders' move. *See ante* at 1369. Consequently, the Raiders were *not* a party to the restraint, and the fault-based offset theory of *Perma-Life* is inapplicable.[8]

## II. Compensation Due the NFL

I also agree that the value of the Los Angeles opportunity, improperly conferred upon the Raiders by the district court's injunction, should be returned to the NFL. However, I do not agree that this value should be offset from pre-trebled actual antitrust damages. By offsetting before trebling in order to compensate the NFL for the lost value of the injunction, the majority effectively requires the Raiders to pay the League three times the value of an opportunity that was only *once* received. It is my view that the overbroad equitable relief the majority attacks is adequately and *properly* addressed by deducting the value of the injunction *after* trebling.[9]

This case presents a unique situation. Pursuant to its equitable powers, the district court issued an injunction against the antitrust violator. That injunction prohibited the NFL's ongoing, illegal restraint of the Oakland Raiders' move into Los Angeles. After liability attached, and the move had been made, this court raised *sua sponte* the issue of whether to deduct the value of the district court's injunction (the value of the opportunity to play football in Los Angeles less the value of the opportunity to play football in Oakland) from the pre-trebled antitrust damages. In addressing this issue of first impression, the majority has failed to seek guidance from cases involving related policy concerns.

In all of the cases discussed below, the governing principle is that the court should *separately* assess all offsets which are not related to the pre-trebled damage calculation. That is, offsets which do not flow from the violation itself should be deducted *after* trebling.[10]

---

**8.** Even were we to find Rule 4.3 illegal per se, I question the majority's dicta that *Perma-Life* supports offsetting the value of a remedy before trebling. The majority's view seems to be a significant extension, unsupported by any authority of which I am aware, of the offhandedly expressed *Perma-Life* principle. Indeed, *Perma-Life* is most often cited in support of vigorous private enforcement of the antitrust laws. *See, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977). The Supreme Court has stated unequivocally that an antitrust plaintiff may recover only for "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent *and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis added). In other words, only detriments and benefits *which flow from the antitrust violation itself* should enter into the calculation of antitrust damages. Since it appears that any "benefits" derived by the Raiders flowed directly from the remedy, and not from the NFL's antitrust scheme, it is inappropriate to apply a *Perma-Life* offset before trebling the damages.

**9.** One can appreciate the fairness of offsetting after trebling in the present case by examining the implications of a slight variation of the facts. What if the Raiders had not sought injunctive relief? In that case, there would be no question of offsetting the value of an equitable remedy. First, the Raiders would receive three times their actual antitrust damages (*i.e.,* three times the lost financial advantages between 1980 and 1982). Only afterwards would the court prevent the ongoing antitrust violation by prohibiting the restraint of the move, but permitting the NFL to charge the Raiders for the value of the move.

In a sense, the mistake the majority commits can be characterized as one of blurring together the distinct benefits conferred by the injunction. First, the injunction prevented an *ongoing* antitrust violation. Second, it effectively conferred upon the Raiders the *value* of the 1982 difference in worth between the Los Angeles and Oakland opportunities, for which the Raiders might have otherwise been charged. The remedy in this case should have been the trebled value of the lost financial advantages plus the right to *purchase* the opportunity to play football in Los Angeles. The amount to which the NFL was entitled incident to the move, improperly conferred upon the Raiders, can be *returned;* but to return this amount, the Raiders need only return it *once, after* trebling. Offsetting before trebling would result in a *treble* return for an improper remedy that was only *once* received.

**10.** In *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972), the offset flowed from the violation.

**A. The Policy Concerns That Motivated Both the *Flintkote* Decision and the Numerous Antitrust Settlement Cases That Followed It, Apply to this Case**

It is by now well-established that if an antitrust plaintiff settles with one defendant, the amount of the settlement is to be set off *after* damages against the remaining defendants have been trebled, and *not before*.[11] The Ninth Circuit established this rule in *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 397–98 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). Other courts have adopted it as well. *See, e.g., Burlington Industries v. Milliken & Co.*, 690 F.2d 380, 393 (4th Cir.1983), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *Hydrolevel Corp. v. ASME*, 635 F.2d 118, 130 (2d Cir.1980), *aff'd on other grounds*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Baughman v. Cooper-Jarrett, Inc.*, 530 F.2d 529, 534 (3d Cir.), *cert. denied sub nom. Wilson Freight Forwarding Co. v. Baughman*, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976); *Wainwright v. Kraftco Corp.*, 58 F.R.D. 9, 12 (N.D.Ga.1973); *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F.Supp. 157, 162 (S.D.N.Y. 1972); *Semke v. Enid Automobile Dealers Ass'n*. 320 F.Supp. 445, 446–47 (W.D.Okla. 1970), *rev'd on other grounds but specifically approved on this point*, 456 F.2d 1361, 1371 (10th Cir.1972).

In *Flintkote*, the Ninth Circuit provided three persuasive reasons for deducting settlement proceeds after trebling damages. 246 F.2d at 397–98. First, the antitrust laws provide that the plaintiff should receive three times the actual antitrust damages. If a court deducts settlement proceeds before trebling, the plaintiff's total award would be less than what the law requires. Second, Congress designed the antitrust laws to encourage suits by private plaintiffs. Offsetting before trebling would diminish the statutory incentive through judicial construction. Third, offsetting before trebling would discourage

plaintiffs from settling, for every dollar received in settlement would result in a three dollar reduction in the final judgment. *See also Burlington Industries*, 690 F.2d at 393; *Hydrolevel*, 635 F.2d at 130; Note, *Contribution and Antitrust Policy*, 78 Mich.L.Rev. 889, 906 n. 87 (1980). While the third concern does not apply to the question of when to offset the value of the district court's injunction, the first and second clearly do. Accordingly, we should heed the plain language of *Flintkote:*

> [A] niggardly construction of the treble damage provisions would do violence to the clear intent of Congress. The private antitrust action is an important and effective method of combatting unlawful and destructive business practices. The private suitor complements the Government in enforcing the antitrust laws. The treble damage provision was designed to foster and stimulate the interest of private persons in maintaining a free and competitive economy. Its efficacy should not be weakened by judicial construction.

246 F.2d at 398.

Admittedly, in *Flintkote, Burlington Industries, Hydrolevel, Baughman, Wainwright, Vandervelde*, and *Semke*, the offsets represented settlements by defendants whereas, here, the offset under consideration is the value of an injunction. Nonetheless, I find no support in authority or reason for the contention that this factual distinction is material. Thus, these cases reinforce my belief that we should offset *after* trebling.

**B. Analogies to Either (1) the Sole Antitrust Case Involving Both a Counterclaim and an Offset Where Plaintiff Did Not Contribute to His Antitrust Injury, or (2) Cases Involving Violations of Orders Setting Rental Ceilings, Suggest the Same Result: Offset After Trebling**

Of the antitrust cases involving offsets where the plaintiff did not participate in

---

**11.** Obviously, this rule applies only when *all* of the defendants are jointly and severally liable for the antitrust damages.

the antitrust scheme,[12] only one case deals with counterclaims rather than settlements. In *Jerard Associates · v. Stanley Works*, 1966 Trade Cases (CCH) ¶ 71,820 (S.D.N.Y.), the court held that the rationale of *Flintkote* applied equally well to counterclaims and, thus, decided to offset after trebling. The court went on to say: "We see no reason in law or justice why we should emasculate the treble damage provision by artificially trebling defendant's counterclaim...." One might equally well remark in the present context that there appears to be no reason in law or justice why this court should emasculate the treble damage provision by deducting the value of the injunction before trebling—*i.e.*, artificially trebling the value of the injunction. Indeed, in *Jerard*, the court specifically stated that "[t]he purpose of the treble damage provision requires that *any* set-off to an antitrust judgment be deducted after trebling because a narrow construction of § 4 would do violence to the congressional purpose of aiding the enforcement of the antitrust laws by providing an incentive for private antitrust actions ... [citations omitted, emphasis added]."

Another analogy may be drawn to cases dealing with violations of orders setting rental ceilings under the Emergency Price Controls acts of World War II. Under those acts, courts awarded treble damages to the tenants of landlords who willfully violated rental ceiling orders. The cases held that actual damages should be trebled first, and that only afterwards should the amount of any unpaid rent be deducted from the trebled figure. In other words, offsets which do not flow from the violation itself should occur only *after* damages have been trebled. *See Waters v. Turner*, 76 F.Supp. 279 (E.D.Pa.1948); *Sampson v. Thomas*, 76 F.Supp. 691 (E.D.Mich.1948).

Together with *Flintkote* and *Jerard*, these cases demonstrate that where the law has a punitive objective in trebling compensatory damages, offsets from the judgment must be made *after* the actual

damages are trebled in order to serve that objective properly. The antitrust law applicable to the present case, 15 U.S.C. § 15, provides that the plaintiff "shall recover threefold the damages by him sustained." This court should have followed the Ninth Circuit's decision in *Flintkote* by holding that the purpose of those words would best be carried out by offsetting the value of the injunction after the jury verdict had been trebled.

---

12. In *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972), the plaintiff *did* participate in the antitrust scheme.