**THURMAN INDUSTRIES, INC., a Washington corporation, Plaintiff,**

**v.**

**PAY'N PAK STORES, INC., a Washington corporation, Defendant.**

No. C84–1171R.

United States District Court, W.D. Washington at Seattle.

May 27, 1987.

Earle J. Hereford, Jr., Jerry R. McNaul, Culp, Guterson & Grader, Seattle, Wash., for plaintiff.

Marvin L. Gray, Jr., Seattle, Wash., for defendant.

## ORDER RE DEFENDANT'S SUMMARY JUDGMENT MOTIONS

ROTHSTEIN, Chief Judge.

DEFENDANT Pay'N Pak seeks summary judgment on: plaintiff's preferential pricing claims; refusal to deal claims; the remainder of plaintiff's Sherman Act claims; and plaintiff's claims brought under the Robinson–Patman Act and the Washington State Consumer Protection Act. The court has considered the memoranda and affidavits submitted by counsel and finds and rules as follows:

Plaintiff and defendant sell home improvement supplies. In September, 1984, plaintiff filed this lawsuit against defendant, alleging that defendant was engaging in anticompetitive practices prohibited by state and federal antitrust laws. Included in plaintiff's complaint are claims for (1) actual monopolization in violation of section 2 of the Sherman Act, (2) attempted monopolization in violation of section 2 of the Sherman Act, (3) participation in a conspiracy in restraint of trade in violation of section 1 of the Sherman Act, (4) buyer liability for participating in a discriminatory pricing scheme in violation of section 2(f) of the Robinson–Patman Act, (5) accepting products which were reduced in price in lieu of a brokerage commission in violation of section 2(c) of the Robinson–Patman Act, (6) violations of the Washington State Consumer Protection Act based on the facts which provide the basis for the federal antitrust claims, and (7) various common law business torts.

Discovery has been completed in this case. Defendant has filed four motions for summary judgment with respect to various aspects of plaintiff's claims. First, defendant has filed a motion which concerns plaintiff's ability to prove damages on its antitrust claims, together with arguments as to the proper product and geographic markets at issue in this case. This motion has general application to all of plaintiff's claims brought under the Sherman Act. Second, defendant has filed two motions regarding individual claims brought by plaintiff under the Sherman Act. In particular, plaintiff alleges that two types of

anticompetitive behavior at issue in this case are (1) defendant's actions in pressuring home improvement supply dealers and their representatives to refuse to deal with plaintiff ("the refusal to deal claims") and (2) defendant's actions in obtaining preferential terms in purchasing items from various dealers and their representatives ("the preferential pricing claims"). Defendant, in its motions, argues that plaintiff has not produced sufficient evidence on these claims to present them to a jury. Finally, defendant has filed a motion concerning plaintiffs' price discrimination claims brought under the Robinson–Patman Act. Defendant argues that plaintiff's claims are factually insufficient with respect to three dealers. Defendant is silent as to the price discrimination claims concerning several other dealers.

## I. DEFENDANT'S MOTION CONCERNING ALL SHERMAN ACT CLAIMS

In its first motion, defendant asserts two broad challenges to plaintiff's ability to bring its antitrust claims. First, defendant argues that plaintiff has failed to establish a proper product or geographic market necessary to determine whether defendant has the requisite market power to assess liability under the Sherman Act. Second, defendant contends that the expected testimony of plaintiff's expert witness, Roy Weinstein, is so flawed that he should be precluded from testifying in this case.

### A. The Product Market

■ Plaintiff has used a "product cluster" approach in defining the relevant product market. Plaintiff contends that the product market at issue consists of a bundle of building, plumbing, and electrical supplies for use primarily by home remodelers and do-it-yourselfers, together with the services offered by a knowledgeable sales staff. This use of a goods and services cluster is an acceptable method of defining a product market. *See, e.g., United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Defendant contends, however, that the evidence offered by plaintiff in support of the proposed product market does not meet the legal requirements for asserting a product cluster market.

■ The standard test for determining a product market is to include in the market all those commodities that are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The courts have recognized that goods sold in conjunction with other goods and/or services may, under the proper conditions, comprise a distinct product market:

> This cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately. Thus the full service feature of commercial banks led the Supreme Court to find a cluster of products and services as the relevant product market in *United States v. Philadelphia National Bank*, 374 U.S. 321, 356 [83 S.Ct. 1715, 1737, 10 L.Ed.2d 915] ... (1963) and *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 360 [90 S.Ct. 2035, 2042, 26 L.Ed.2d 658] ... (1970). The rationale was that consumers do not generally shop for individual banking services, especially because it is usually easier to obtain some services, e.g., loans, at the same bank where other services, e.g., savings accounts, are held.

*JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1016 (9th Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

The Tenth Circuit has applied the *JBL Enterprises* test for the appropriate use of a product cluster market in a factual context similar to the present case. In *Westman Commission Company v. Hobart International, Inc.*, 796 F.2d 1216 (10th Cir. 1986), plaintiff brought suit under section 1 of the Sherman Act, alleging that defendant and one of defendant's distributors conspired to prevent plaintiff from selling defendant's line of restaurant supplies in the Denver area. The trial court had recognized a distinct market for a full line of

restaurant supplies. The trial court stated that this market definition was based on a recognition that "customers obtain convenience, cost savings and better service from a 'one-stop shopping' distributor than from houses specializing in selected products." *Westman, supra,* 796 F.2d at 1220.

On appeal, the Tenth Circuit rejected the trial court's definition of the relevant product market:

> In defining the relevant market as "one-stop shopping," the trial court apparently focused on the system of product distribution rather than the market facing the consumer of restaurant equipment. The trial court's focus justified the conclusion that "one-stop distribution" is an effective way to compete in the market. But the fact that "one-stop distribution" is an effective or even superior way to compete does not mean that the relevant market is limited to those who use that method of competition. "Any definition of line of commerce which ignores the buyers and focuses on what sellers do, or theoretically can do, is not meaningful."
> ... The fact that a distributor is able to satisfy all of a customer's needs at one location does not mean that it is free from competition from other types of distributors.

*Westman, supra,* 796 F.2d at 1220–21 (citations omitted). The appellate court then examined the record for evidence that the "one-stop shopping" stores constituted a distinct market from the point of view of consumers of restaurant supplies. The court could find no such evidence. The court further noted that because other manufacturers were competing with defendant in the same supply market, the consumers of supplies would be likely to switch to other brands should the price of defendant's supplies climb too high. Accordingly, the court held, as a matter of law, that the relevant product market consisted of, at a minimum, "the products generally sold by restaurant equipment dealers, whether or not those dealers carried a wide enough range of products and brands to be classified as 'one-stop shopping' distributors." *Id.* at 1221.

In the present case, plaintiff supports its products market definition with the testimony of its expert witness, Roy Weinstein. Both plaintiff and Weinstein rely heavily on the deposition testimony of various vendors in the proposed product market. These vendors testified that they perceive their greatest competition to be other full-service home supply dealers. Plaintiff contends that the reason for this perception is that customers prefer the full line of products offered to the consumer together with the availability of a knowledgeable sales staff. Plaintiff concludes that there is at least an issue of fact to the relevant product market in this case.

Crucial to any definition of a product market is an inquiry into how the *consumer* views the product offered for sale. If the consumer is reasonably ready to buy one good in response to a price rise for another good, then the two goods should be included in the same product market. *See, E.I. du Pont, supra,* 351 U.S. at 395, 76 S.Ct. at 1007. Grouping individual products into a product cluster is appropriate if the product bundle appeals to consumers on a different basis from the individual products sold separately. *JBL Enterprises, supra,* 698 F.2d at 1016. *Westman, supra,* 796 F.2d at 1220.

In the present case, plaintiff's expert does not consider consumer preference in drawing his product market conclusion. The discovery relied upon by the expert contains perceptions by full-line distributors that they compete with other full-line distributors. The record also contains evidence that full-line distributors feel that they compete with stores using other methods of distribution. Plaintiff's expert did not rely on any consumer preference statistics in reaching his conclusions.

On the other hand, defendant has supplied studies that indicate that consumers shop a variety of stores for their home improvement supplies. A 1983 study conducted by GMA, Inc. ("the GMA study") revealed that 35% to 65% of consumers for home improvement products made their last purchase at stores other than those full-service stores identified by plaintiff as

being in the relevant market. The GMA study shows that consumers of home improvement products select a particular store for a variety of reasons. The dominant ones being the price of the product and the convenience of the store's location and hours. Product availability is a distant third and the presence of a knowledgeable sales staff ranks as an insignificant factor.

A study done by the Gilmore Research Group ("the Gilmore study") identifies a consumer preference for knowledgeable personnel and a wide variety of products. This study, however, identifies potential competitors of defendant in individual product markets. The study also reveals that defendant experiences significant competition from specialty stores such as Seattle Lighting and from integrated department stores such as Sears. Finally, the 1982 Census of Retail Trade shows that only about 40% of the home improvement products sold that year were purchased at full-service stores.

■ Defendant has provided overwhelming evidence that it competes with stores other than those offering a full line of home improvement supplies. Plaintiff has provided no evidence that consumers consider one-stop distributors to be a distinct and separate market from all other stores that sell home improvement supplies. Based on this record, the court concludes, as a matter of law, that plaintiff has failed to establish a relevant product market for the purpose of assessing liability under the federal and state antitrust laws.

### B. The Geographic Market

This court's ruling as to the relevant product market renders a decision as to the relevant geographic submarkets unnecessary. Nevertheless, the court finds that there are genuine issues of material fact as to whether the geographic submarkets identified by plaintiff correspond to the commercial realities of the home improvement supply industry and are economically significant. See, Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

### C. Affect of Ruling as to the Relevant Product Market

This court has ruled above that plaintiff has failed, as a matter of law, to establish a relevant product market. This failure has a potential affect on plaintiff's claims for (1) actual monopolization under section 2 of the Sherman Act, (2) attempted monopolization under section 2 of the Sherman Act, and (3) participation in a conspiracy in restraint of trade in violation of section 1 of the Sherman Act.

#### 1. Monopolization

■ The elements of plaintiff's monopolization claim are: (1) the possession of monopoly power in the relevant market, (2) the willful acquisition or maintenance of that power, and (3) resulting injury to competition. California Computer Products, Inc. v. IBM Corporation, 613 F.2d 727, 735 (9th Cir.1979). As a threshold requirement to any monopolization claim under section 2 of the Sherman Act, a plaintiff must identify the relevant product and geographic markets. M.A.P. Oil Company, Inc. v. Texaco, Inc., 691 F.2d 1303, 1306 (9th Cir. 1982). Failure to define these markets is fatal to a monopolization claim. Id. at 1308. Therefore, the court's ruling that plaintiff has failed to satisfy this threshold requirement, would require dismissal of plaintiff's monopolization claim. However, even were there a genuine issue of material fact as to the relevant product market in this case, plaintiff's monopolization claim would fail as a matter of law. Plaintiff has failed to create a genuine issue of material fact as to defendant's possession of monopoly power.

Monopoly power is defined as the power to control prices or to exclude competition. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). To determine whether a firm has monopoly power in a given market, courts have often examined the market share of the firm. Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 512 F.2d 1264, 1270 (9th Cir. 1975). The Ninth Circuit has cited with approval Judge Learned Hand's remarks that while 90% of the market is enough to

constitute a monopoly, it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not. *Twin City, supra,* 512 F.2d at 1274, *citing United States v. Aluminum Company of America,* 148 F.2d 416, 424 (2d Cir.1945). The Ninth Circuit has also noted that several courts have held that fifty percent market share is inadequate to establish a proscribed monopoly. *Twin City, supra,* 512 F.2d at 1274. The leading treatise on the subject suggests that a defendant's share of the market must exceed 75% in order to be considered a monopoly. III Areeda & Turner, *Antitrust Law,* ¶ 803 (1978).

■ Under no means of measuring the market share in the present case does defendant's share even approach the 75% level. The Ninth Circuit recognizes, however, that monopoly power may be inferred from factors other than market share. *Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 995 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). Among the factors to be considered in inferring market power are (1) the fragmentation of competition in the market among many small competitors attempting to compete with one very large competitor, (2) high barriers to entry in the market, and (3) expert testimony concluding that there is monopoly power. *Id.* at 995–96.

■ Plaintiff contends that defendant possesses a 40% share in the overall home improvement supply market. Plaintiff has failed to cite any case which upheld a monopolization claim based upon such a small share of the market. Other factors evidencing market power are absent. The evidence on the record indicates that barriers to entry in the home improvement market are not high. Plaintiff itself has entered the market and has experienced growth over the time period at issue. Defendant is not the dominant competitor in the industry facing fragmented competition. All of the studies submitted show that defendant is the second largest competitor among those defined by plaintiff to be participants in the market. This showing of market power is insufficient to state a claim for actual monopolization under section 2 of the Sherman Act.

### 2. Attempted Monopolization

■ The elements of plaintiff's attempted monopolization claim are: (1) specific intent by defendant to control prices or destroy competition, (2) predatory or anticompetitive conduct on the part of defendant directed toward accomplishing that purpose, and (3) a dangerous probability of success. *Rickards v. Canine Eye Registration Foundation,* 783 F.2d 1329, 1335 (9th Cir.) *cert. denied,* 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986). The role of market share evidence in an attempted monopolization case is somewhat unclear. While proof of market power and the element of dangerous probability of success are closely related, they are not equivalent. *William Inglis & Sons Baking Co. v. ITT Continental Baking Company, Inc.,* 668 F.2d 1014, 1029 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982). In the absence of proof of a relevant market and market power, however, a plaintiff must prove either predatory conduct or a *per se* violation of section 1 of the Sherman Act to prove an attempt to monopolize in violation of section 2 of the Sherman Act. *M.A.P. Oil Company, Inc. v. Texaco, Inc.,* 691 F.2d 1303, 1309 (9th Cir.1982).

In the present case, plaintiff's predatory pricing claims have withstood a motion for summary judgment. If proven, this alleged conduct could provide a basis for an attempted monopolization regardless of plaintiff's inability to establish a relevant product market. In consequence, the motion of defendant must be denied with respect to plaintiff's attempted monopolization claim.

### 3. The Conspiracy Claims

In addition to the section 2 claims, plaintiff has alleged that defendant violated section 1 of the Sherman Act by participating in a conspiracy in restraint of trade. In particular, plaintiff contends that defendant and various home improvement supply dealers and their representatives conspired

to give preferential terms to defendant at the expense of plaintiff and to refuse to sell certain items to plaintiff. The court's ruling as to plaintiff's failure to establish a relevant product market has a potential impact on these claims.

Unless the alleged conspiracy involves a *per se* violation of the Sherman Act, the conspiracy is examined under a rule of reason to determine its legality. *Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors*, 786 F.2d 1400, 1405 (9th Cir.1986). Proof that a defendant's activities had an impact upon competition in a relevant product market is an absolutely essential element of a rule of reason case. *Id.* Since the court has ruled that plaintiff has failed to establish a relevant product market and if plaintiff's conspiracy claims are subject to the rule of reason, the claims must be dismissed.

■ Plaintiff contends that defendant participated in a conspiracy to induce preferential prices and terms. Such a preferential pricing scheme does not constitute a *per se* violation of the Sherman Act. *Zoslaw v. MCA Distributing Corporation*, 693 F.2d 870, 886 (9th Cir.1982). In consequence, plaintiff's preferential pricing claims must be dismissed.

Next, plaintiff contends that defendant induced various dealers and dealer representatives to refuse to sell products to plaintiff. These claims concern an alleged conspiracy between participants at two different levels of market organization. The Supreme Court has provided some guidance as to the proper analysis of such a claim:

> [An] important distinction in distributor-termination cases is that between concerted action to set prices and concerted action on nonprice restrictions. The former have been per se illegal since the early years of national antitrust enforcement.... The latter are judged under the rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition....

*Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (citations omitted). The Ninth Circuit has held that if a dealer terminates a distributor in response to a competing distributor's complaint *and* with the intent to restrain price competition, the alleged conspiracy may warrant *per se* analysis. *Zidell Explorations, Inc. v. Conval International Ltd.*, 719 F.2d 1465, 1470 (9th Cir.1983); *O.S.C. Corporation v. Apple Computer, Inc.*, 792 F.2d 1464, 1476 (9th Cir.1983). Absent a common purpose to eliminate price competition, the alleged conspiracy must be considered under a rule of reason analysis. *See, General Business Systems v. North American Philips Corporation*, 699 F.2d 965, 978–9 (9th Cir.1983).

■ In the present case, plaintiff has presented evidence to create genuine issues of material fact as to whether defendant and the distributors agreed to an exclusive dealing arrangement. Plaintiff has presented no evidence, however, that the dealers entered into such an agreement to prevent price competition on their products. Such evidence of a common purpose is essential to prove a claim of a *per se* violation of section 1 of the Sherman Act. *Monsanto, supra*, 465 U.S. at 763–64, 104 S.Ct. at 1470; *Zidell, supra*, 719 F.2d at 1470. In consequence, plaintiff's refusal to deal claims fall within a rule of reason analysis. As plaintiff has failed to establish the relevant market necessary to prove a rule of reason claim, plaintiff's refusal to deal claims must be dismissed.

### D. The Testimony of Weinstein

Plaintiff has retained the services of Roy Weinstein, an economist, to testify about various economic issues that will arise at trial. In his affidavit, Weinstein states that he has helped plaintiff to define the relevant product and geographic markets, to assess the anti-competitive nature of defendant's conduct, and to determine the damages suffered by plaintiff in the relevant markets as a result of the anticompetitive behavior. In this affidavit, Weinstein also describes the materials that he relied upon in reaching his conclusions. It ap-

pears that Weinstein relies heavily upon facts derived from deposition testimony obtained through discovery in this case. In addition, Weinstein reviewed maps, census data, and trade press materials.

In determining the amount of damages, Weinstein has developed two different analytical methods. He describes these methods in his affidavit:

> Method I involves calculation of the difference between actual sales per customer in damaged Thurman stores during the damage period and sales per customer during an appropriate benchmark period. Method II involves a comparison between Thurman's market share in each of the relevant submarkets with its 1981 market share in each submarket.

Weinstein identifies the damages under each calculation as "lost sales" due to defendant's anticompetitive behavior.

Defendant objects to these calculations on three interrelated grounds: (1) the study fails to draw any causal link between the alleged anticompetitive behavior and the damage suffered, (2) the study fails to account for legitimate changes in the market structure, and (3) the study provides no mechanism for reducing damages should the defendant show that certain acts were not anticompetitive. In sum, defendant argues that the damages study would require the jury to engage in undue speculation as to any monetary award.

The federal and state antitrust laws provide remedies, including treble damages, for injuries suffered as a result of behavior which causes injury to competition. *See, Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In the present case, plaintiff's claims for predatory pricing have withstood a motion for summary judgment. This type of behavior results in some injury to competition. *See, Transamerica Computer Co., Inc. v. IBM Corporation*, 698 F.2d 1377 (9th Cir.) *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). A showing that some damage was due to unlawful competition usually provides sufficient evidence of an antitrust injury to permit damages issues to go to the jury.

*Farley Transportation Co., Inc. v. Santa Fe Trail Transportation Co.*, 786 F.2d 1342, 1350 (9th Cir.1985). Nevertheless, in light of the prior rulings of this court with respect to plaintiff's preferential pricing and refusal to deal claims, Weinstein's submitted testimony as to damages should not be presented to the jury.

■ Weinstein states that he considered all of the anticompetitive behavior alleged by plaintiff in reaching his damages figure. This behavior would include the preferential pricing practices and refusal to deal claims for which the court has granted summary judgment in favor of defendant. In consequence, it appears that Weinstein's study is based on practices which no longer form a basis for an antitrust claim in this case. As Weinstein has not allocated damages among the alleged anticompetitive practices, the court's rulings have cast doubt on the validity of Weinstein's study.

The Seventh Circuit has faced a similar issue with respect to damages in an antitrust case. In *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081 (7th Cir.) *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), plaintiff MCI had alleged twenty-two illegal practices engaged in by defendant ATT. Only seven of the acts were found to be illegal by the jury. Nevertheless, MCI's damages study assumed that harm was suffered as a result of all twenty-two alleged illegal acts. The evidence submitted at trial left the jury with no way to adjust the amount of damages to reflect lawful competition from ATT. The Seventh Circuit reversed a substantial jury verdict in favor of MCI:

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damages. This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts.... To allow otherwise would force a defendant to pay tre-

ble damages for conduct that was determined to be entirely lawful. *MCI Communications, supra,* 708 F.2d at 1162–63.

With the dismissal of several of plaintiff's claims in the present case, it appears that a jury verdict based on Weinstein's damages calculation would not find substantial support in the record and may not be reasonable in light of the totality of the evidence. *See, Los Angeles Memorial Coliseum Commission v. National Football League,* 791 F.2d 1356, 1365–66 (9th Cir. 1986). In consequence, plaintiff should not be able to submit the testimony of Weinstein as to damages in light of the current posture of this case.

Despite the current inadequacies of the Weinstein study, the court declines to grant summary judgment in favor of defendant on the remaining Sherman Act claims. Rather, plaintiff will be provided the opportunity to elicit new damages testimony and defendant may conduct discovery as to the new testimony. The parties shall contact the court within ten days from the date of this order with a proposed discovery schedule as to any new damages testimony.

### E. *Plaintiff's Claims Under the Washington State Consumer Protection Act*

 Plaintiff asserts several claims under the Washington State Consumer Protection Act based on the same facts that make up its Sherman Act claims. The Consumer Protection Act has been determined to be, at the most inclusive, co-extensive with the Sherman Act. *See, State v. Black,* 100 Wash.2d 793, 676 P.2d 963 (1984). To the extent that this court has dismissed plaintiff's Sherman Act claims, in consequence, the Consumer Protection Act claims are also dismissed.

## II. DEFENDANT'S MOTION CONCERNING PLAINTIFF'S PREFERENTIAL PRICING AND REFUSAL TO DEAL CLAIMS

Defendant has filed a motion for summary judgment on plaintiff's preferential pric-

ing and refusal to deal claims. The court has previously ruled that plaintiff's claims as to preferential pricing and refusal to deal should be dismissed as plaintiff has failed to establish a relevant product market. In consequence, a ruling on the separate motions as to these claims is unnecessary. The court will deny these motions as moot.

## III. DEFENDANT'S MOTION CONCERNING PLAINTIFF'S CLAIMS BROUGHT UNDER THE ROBINSON–PATMAN ACT

Plaintiff asserts that defendant violated the terms of the Robinson–Patman Act by knowingly receiving unlawful price concessions from over 20 suppliers and by receiving price discounts in lieu of brokerage fees from seven of the suppliers. Defendant moves for summary judgment on these claims as the claims relate to three dealers: Hytec, Unarco, and Keller Aluminum Products ("Keller").

### A. *Buyer Liability Under Section 2(f)*

Section 2(f) of the Robinson–Patman Act makes it unlawful:

> for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

15 U.S.C. § 13(f)

#### 1. Jurisdiction

 Defendant violates section 2(f) only if plaintiff can show that there was a price discrimination prohibited by section 2(a). *Great A & P v. Federal Trade Commission,* 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). For an alleged price discrimination to fall within the jurisdictional bounds of section 2(a), at least one of the two transactions which, when compared, generate a discrimination must cross a state line. *Gulf Oil Corporation v. Copp Paving Co.,* 419 U.S. 186, 200–01, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974). In the present case, defendant has presented evidence that all of the products that Hytec sold to plaintiff and to defendant were manufactured at the Hytec factories in the state of Washington.

*See,* affidavit of Chauncey Lufkin. These products were shipped from the Washington factories to the Washington stores of plaintiff and defendant. Plaintiff has submitted no evidence to the contrary. In consequence, summary judgment must be granted with respect to the section 2(f) claims concerning sales by Hytec.

### 2. Seller Defenses

■■■ There are two major defenses to a Robinson–Patman claim—the cost justification defense embodied in section 2(a) and the meeting competition defense found in section 2(b). In the present motion, defendant discusses the price discounts offered by three vendors and concludes that plaintiff cannot show that the defenses are unavailable with respect to these vendors. Defendant has presented evidence that the price discounts offered to defendant by Unarco and by Keller were justified by the cost advantage in selling to defendant. Defendant has also presented evidence that the discounts offered by Hytec were permissible under either the cost justification defense or the meeting competition defense. While plaintiff cites to portions of the record concerning sales made by vendors other than those addressed in defendant's motion, plaintiff remains silent as to the vendors discussed by defendant. In consequence, summary judgment on the § 2(f) claims must be granted with respect to the claims concerning Hytec, Unarco, and Keller. *See, Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (when moving party has provided evidence as to an issue on summary judgment, non-moving party must come forward with specific evidence showing that there is a genuine issue of material fact for trial in order to avoid summary judgment).

In their memoranda, the parties argue extensively with respect to issues regarding the burden of proof in establishing a seller defense and regarding a knowledge requirement to a section 2(f) buyer liability claim. As there remain Robinson–Patman Act claims with respect to numerous other vendors, the court finds it appropriate to rule as to these issues.

#### a. The Cost Justification Defense

■■■ In *Automatic Canteen Company of America v. Federal Trade Commission,* 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), the Supreme Court considered the burden of proof issue as to the cost justification defense. The Court held that the burden of introducing the evidence regarding the unavailability of the cost justification defense rests with the plaintiff in a buyer liability action. *Id.* at 82, 73 S.Ct. at 1028–29. This court finds plaintiff's argument that a different rule should apply in a private Robinson–Patman action unpersuasive. Plaintiff has the burden of coming forward with evidence regarding the unavailability of the cost justification defense in the present case.

#### b. The Meeting Competition Defense

The *Automatic Canteen* decision does not discuss burden of proof issues as to the meeting competition defense. A crucial portion of the Court's ruling on the cost justification defense, however, involved considerations of fairness as to which party would more likely be able to have access to information relevant to the defense. The Court offered this observation on the meeting competition defense of section 2(b):

> Our view that § 2(b) permits consideration of conventional rules of fairness and convenience of course requires application of those rules to the particular evidence in question. Evidence, for example, that the seller's price was made to meet a competing seller's offer to a buyer charged under § 2(f) might be available to a buyer more readily even than to a seller.

*Automatic Canteen, supra,* 346 U.S. at 79, n. 23, 73 S.Ct. at 1027, n. 23. This language at least suggests a ruling as to the burden of proof in a meeting competition context may be different than the ruling in a cost justification context.

Unlike the situation with the cost justification defense, the meeting competition defense concerns market factors that are not

exclusively within the control of the seller. Information as to the seller's competition and the prices in the market is especially available to the buyer. While the buyer may not have evidence relating to a seller's state of mind in quoting a low price, the buyer is aware as to whether the price is generally competitive with the price of other sellers. It is up to the buyer to come forward with evidence in this regard if it desires to take advantage of the meeting competition defense. *But see, Mid–South Distributors v. Federal Trade Commission*, 287 F.2d 512, 517 (5th Cir.), *cert. denied*, 368 U.S. 838, 82 S.Ct. 36, 7 L.Ed.2d 39 (1961).

In the present case, the court rules that defendant has the burden of coming forward with the evidence in support of any meeting competition defense. This ruling comports with the considerations of fairness used by the Court in *Automatic Canteen*.

### c. Knowledge

■ Section 2(f) prohibits buyers from knowingly accepting a discriminatory price. Defendant argues that in order to state a section 2(f) claim, plaintiff must prove that defendant had actual knowledge that the price received was in violation of § 2(a). Plaintiff, in response, argues that it must prove only that defendant knew or should have known that various sellers were engaging in unlawful price discrimination.

The only reported Ninth Circuit decision on the knowledge issue supports plaintiff's position. In *Fred Meyer, Inc. v. Federal Trade Commission*, 359 F.2d 351 (1968), *rev'd on other grounds*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), the court considered a defendant's knowledge of discriminatory pricing where the defendant had operated a "vigorous intelligence network" of comparison shopping and review of price bulletins. The court held that this network should have put defendant on notice that the prices it received from its suppliers were less than the prices received by its competitors:

It must be remembered that the inquiry here is as to what petitioner knew *or had reason to know* ...

[T]he mere fact that the record fails to show exact knowledge by [defendant] of the precise identity of each competitor in each particularized kind and grade of goods and of the prices paid by competitors for them cannot avail the petitioner: It had "reason to know."

*Fred Meyer, supra,* 359 F.2d at 367 (emphasis in original). The Ninth Circuit later used this standard in affirming a district court judgment that a defendant did not violate § 2(f) of the Robinson–Patman Act. *Texas Gulf Sulphur Co. v. J.R. Simplot Co.,* 418 F.2d 793, 804 (9th Cir.1969) ("... the findings were ... (d) that Simplot *had no reasons to believe* that Texas Gulf would give less favorable terms to any other customer or would discriminate against any customer; [Finding 45] ....") (emphasis added).

Plaintiff in the present case may prove its section 2(f) claims by showing that defendant received discriminatory prices while defendant knew or should have known that those prices violated § 2(a) of the Robinson–Patman Act.

### B. Alleged Violations of Section 2(c)

Section 2(c) of the Robinson–Patman Act makes it unlawful for sellers to pay brokerage commissions to their purchasers or to give them discounts or allowances in lieu of such commissions. In addition, buyers cannot accept discounts in lieu of brokerage commissions. 15 U.S.C. § 13(c). In the present case, plaintiff contends that defendant has violated section 2(c) with respect to transactions with seven sellers. Defendant moves for summary judgment on these claims concerning Hytec, Unarco, and Keller. Defendant argues that these claims are insufficient for one of three reasons: (1) lack of jurisdiction over the transactions, (2) the existence of other reasons justifying the price discounts, and (3) the lack of defendant's knowledge that it was receiving discounts in lieu of brokerage commissions.

### 1. Jurisdiction

■ The Ninth Circuit cases addressing the jurisdictional reach of § 2(c) indicate that the "in commerce" requirement of § 2(c) is broader than the "in commerce" requirement of § 2(a). Under § 2(c), a violation may occur when an intrastate transaction influences interstate competition. *Rangen, Inc. v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851, 861 (9th Cir.1965), *cert. denied*, 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966). If one of the companies involved in the transaction is an interstate company and if the payment in lieu of a commission may benefit that company in its interstate operations, the jurisdictional requirements of § 2(c) are met. *Id.* at 861. *See also, May Department Store v. Graphic Process Co.*, 637 F.2d 1211, 1216 (9th Cir.1980) ("The interstate character of the companies involved may provided a sufficient commerce nexus to meet the jurisdictional requirement.").

Despite defendant's arguments that the Ninth Circuit rule is not well-supported in logic, this court is bound by the holding in *Rangen.* The evidence in this case shows that defendant is an interstate company and that its purchases from Hytec, Unarco, and Keller may have benefited its interstate business. In consequence, plaintiff's claims under § 2(c) cannot be dismissed on jurisdictional grounds.

### 2. Other Reasons for the Discounts

■ In its motion, defendant contends that Hytec, Unarco, and Keller had several reasons for offering defendant a price discount, including: (1) competitive pressure, (2) promotional allowances, (3) allowances in lieu of prompt payment discounts, and (4) volume allowances. Defendant contends that plaintiff cannot prove that defendant received any discounts in lieu of brokerage commission. In response, plaintiff has provided evidence that defendant bargained for better prices by suggesting to sellers that they reduce the brokerage commission on the sale.

There are few cases as to what defenses are available to a buyer in a § 2(c) claim. The statute permits the buyer to perform some brokerage service for the seller and to receive compensation for those services. The Supreme Court has also cautioned that not every reduction in price accompanied by a reduction in a commission is a violation of § 2(c). *Federal Trade Commission v. Henry Broch & Co.*, 363 U.S. 166, 175, 80 S.Ct. 1158, 1163, 4 L.Ed.2d 1124 (1960). "Whether such a reduction is tantamount to a discriminatory payment of brokerage depends on the circumstances of each case." *Id.* at 176, 80 S.Ct. at 1164.

Both parties have presented reasons as to why defendant received a lower price on some items than plaintiff received. It is a jury question as to which of these versions for the justification of the lower prices is to be believed. In consequence, summary judgment must be denied on this issue.

### 3. Knowledge

■ The parties have raised the issue as to whether the buyer must be aware of the discount in brokerage commission in order to be liable under § 2(c). There is no statutory language which would establish a knowledge requirement for buyer liability. Plaintiff cites several cases which indicate that there is no knowledge requirement for seller liability. Defendant argues, however, that Congress could not possibly have provided for strict liability whenever a buyer receives discounts in lieu of brokerage commissions.

In *Federal Trade Commission v. Henry Broch & Co.*, 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960), the Supreme Court considered the issue of buyer knowledge in a seller liability context:

The fact that the buyer was not aware that its favored price was based in part on a discriminatory reduction in respondent's brokerage commission is immaterial. The Act is aimed at price discrimination, not conspiracy. *The buyer's intent might be relevant were he charged with receiving an allowance in violation of § 2(c).* But certainly it has no bearing on whether the respondent has violated the law. The powerful buyer who demands a price concession is concerned only with getting it. He does not care whether it comes from the seller, the seller's broker, or both.

363 U.S. at 174, 80 S.Ct. at 1163 (emphasis added). This language suggests that buyer culpability is a requirement for buyer liability under § 2(c). Plaintiff must prove that defendant knew or should have known that it was receiving price discounts in lieu of brokerage commissions.

### C. Consumer Protection Act Claims

 Plaintiff asserts that defendant's alleged violations of the Robinson–Patman Act are also violations of the Washington State Consumer Protection Act, RCW 19.86 ("CPA"). Defendant moves for summary judgment on these claims on the ground that the CPA does not prohibit the type of price discrimination prohibited by the Robinson–Patman Act. The motion must be denied.

RCW 19.86.020 parallels § 5(a)(1) of the Federal Trade Commission Act ("the FTC Act"). In interpreting the state act, the courts are to be guided by federal interpretations of similar federal statutes. RCW 19.86.920. Section 5 of the FTC Act prohibits conduct that violates the Clayton Act. *Federal Trade Commission v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 394, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953). As the Robinson–Patman Act constitutes amendments to the Clayton Act, the Robinson–Patman prohibitions should similarly fall within the purview of § 5 of the FTC Act. At least one court has expressly so held. *American News Co. v. Federal Trade Commission,* 300 F.2d 104, 108 (2d Cir.), *cert. denied,* 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962). In consequence, the alleged violations of the Robinson–Patman Act also state a claim under the CPA.

To the extent, however, that plaintiff alleges CPA claims for section 2(f)–type buyer liability with respect to transactions involving Unarco, Hytec, and Keller, the CPA claims should be dismissed as plaintiff has failed to come forward with any evidence to rebut defendant's evidence of seller defenses.

### IV. CONCLUSION

Defendant's summary judgment motion as to plaintiff's Sherman Act claims is GRANTED IN PART and DENIED IN PART. Plaintiff's claims for monopolization, preferential pricing, and refusal to deal are DISMISSED.

Defendant's summary judgment motion as to plaintiff's preferential pricing claims is DENIED as moot. Defendant's summary judgment motion as to plaintiff's refusal to deal claims is DENIED as moot.

Defendant's summary judgment as to plaintiff's claims brought under the Robinson–Patman Act is GRANTED IN PART and DENIED IN PART. Plaintiff's claims brought under § 2(f) of the Robinson–Patman Act and under the CPA for § 2(f)–type buyer liability are DISMISSED with respect to the transactions involving Hytec, Unarco, and Keller.